## D & S COAL COMPANY, INC., Plaintiff,

v.

## USX CORPORATION (formerly United States Steel Corporation), Defendant.

### Civ. No. 1–85–791.

United States District Court, E.D. Tennessee, S.D.

Feb. 5, 1988.

Ray H. Moseley, Chattanooga, Tenn., for plaintiff.

Howard G. Swafford, Jasper, Tenn., James E. Moffitt, Chattanooga, Tenn., for defendant.

## MEMORANDUM

EDGAR, District Judge.

Plaintiff D & S Coal Company, Inc. ("D & S") contended at the trial of this case that on March 14, 1985, it negotiated a coal lease with defendant USX Corporation (at that time called U.S. Steel Corporation and herein referred to as "U.S. Steel"). Present at this March 14, 1985 meeting, the plaintiff contends, was Melissa Marvin, representing D & S, and Buck Layne, Jr.,[1] who

---

**1.** Buck Layne, Jr. was an intervening plaintiff in this case. However, the Court directed a verdict

was to contract with D & S[2] to do the mining work. Representing U.S. Steel were Messrs. Gary Sides and Dan Clark, both employees of U.S. Steel. There actually was a meeting to discuss a coal lease. However, for the reasons specified below, the Court concludes that such meeting did not occur until March 27, 1985.

Plaintiff contended that the parties orally finalized a lease on the date of the meeting (plaintiff said March 14th) and "shook" on it. Plaintiff contended that the only thing remaining to do in order to consummate the deal was to receive the full written lease from U.S. Steel and execute it. U.S. Steel denied that any lease was finalized, saying that Mr. Sides, its primary representative at the meeting, had no authority to enter into such a lease and had explained this to Ms. Marvin and to Layne. U.S. Steel, through its witnesses, says that it was in no position to enter into a coal lease with D & S because at the time no one knew, including Marvin and Layne, how much coal was on the property to be leased, and therefore there was no way that the parties could arrive at an agreement on royalties, an essential term to any mining lease. Moreover, U.S. Steel says that it had no evidence of insurance coverage from D & S and no information on the financial condition of D & S. Therefore, says U.S. Steel, it is evident that there could have been no agreement on a lease on March 27th. U.S. Steel did issue a prospecting permit to Mr. Layne dated March 25th, but not actually received by D & S until after the 27th, and on April 5, 1985, D & S filed a notice of intent to explore with the Office of Surface Mining, U.S. Department of the Interior. The plaintiff, through Mr. Layne, did some road improvement work on Jones Point Road, which led from a paved road down towards the area that plaintiff wanted to mine. The Jones Point Road was, and is, a road used by area residents and others—and was, and is, passable with four-wheel drive vehicles. At a point shortly after this road leads downward over the escarpment of the Cumberland Plateau, it crosses an area that was surfaced mined in the 1950s and continues on to a location where Mr. Layne has a hunting cabin, and further down into the Sequatchie Valley. Mr. Layne planned to mine at a location some distance from where Jones Point Road crosses the old surface mine. To reach the proposed mining location, one would be required to follow the spoil banks from the previous mining operations laterally around the edge of the escarpment away from the Jones Point Road. Layne constructed a road through these spoil banks to access the area where he was prospecting for D & S's planned mine.

At the March 14th/27th meeting, Layne contends that he had U.S. Steel's agreement that he could close any road in connection with his mining operation on behalf of D & S so long as the road was on U.S. Steel's property. Mr. Sides, on the other hand, says that he told Layne that he could block roads on U.S. Steel property only so long as they were not "public" roads. Layne put a gate on the Jones Point Road over a mile from the proposed mine site and gave keys to some of his friends. He also blocked off another road, the "Rankins Lease Road," leading into the general area by felling upwards of 100 trees across it and bulldozing dirt piles. The result was that a good many of the local inhabitants became exceedingly irate, and there were "rumors" that U.S. Steel might suffer some forest fires on its land if the roads were not unblocked. Mr. Sides of U.S. Steel told Layne to unblock the roads—which Layne did.

There is a dispute about whether Sides told Layne that he could build a gate, and thereby protect his mine site, where the new road that Layne had built to the proposed mine leaves Jones Point Road. In any event, Layne never constructed a gate at this latter location. Instead, he told U.S. Steel that if he could not block the roads as he had done, then he did not want to mine —and that he would file suit against U.S.

for the defendant as against Layne at the close of Layne's proof.

**2.** Actually D & S was not incorporated until May 7, 1985.

Steel for the expenses that he had incurred in fixing up the road. Hence this lawsuit.

At various times in this case, plaintiff has traveled on differing theories. This Court sustained a statute of frauds defense to plaintiff's claim under the alleged lease. The case eventually came to trial on a theory of promissory estoppel as outlined by section 139 of the *Restatement (Second) of Contracts.* No Tennessee court of record has explicitly recognized section 139 of the *Restatement* as a means of alleviating a situation where allowing the statute of frauds defense might perpetuate a fraud. However, this Court determined that there was some authority for this viewpoint. *See Price v. Tennessee Products & Chemical Corp.,* 53 Tenn.App. 624, 385 S.W.2d 301 (1964).[3] There is at least one Tennessee Court of Appeals case that recognizes promissory estoppel in a non-statute of frauds context to circumvent the defense of lack of consideration. *Foster & Creighton Co. v. Wilson Contracting Co., Inc.,* 579 S.W.2d 422 (Tenn.App.1978), *cert. denied,* March 19, 1979. *See Owen of Georgia, Inc. v. Shelby County,* 648 F.2d 1084, 1095 (6th Cir.1981). However, the Tennessee Supreme Court has declined to address whether Tennessee recognizes promissory estoppel to allow enforcement of promises unsupported by consideration as embodied in *Restatement of Contracts* § 90. *Alden v. Presley,* 637 S.W.2d 862, 864 (Tenn.1982).[4]

In any event, this case was submitted to the jury on a promissory estoppel theory. Section 139(1) of the *Restatement (Second) of Contracts* provides as follows:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the statute of frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

After a trial before a six-person jury, the Court propounded the following interrogatories to the jury:

QUESTION NO. 1:

Did defendant U.S. Steel promise to lease the land in issue to plaintiff D & S Coal Company?

QUESTION NO. 2:

If there was such a promise, should defendant U.S. Steel have reasonably foreseen that D & S Coal Company would rely on its promise to lease the land?

QUESTION NO. 3:

Did plaintiff D & S Coal Company reasonably rely on defendant U.S. Steel's promise to lease the land and was D & S Coal Company damaged by such reliance?

QUESTION NO. 4:

Is the enforcement of U.S. Steel's alleged promise to lease the land the only way to avoid injustice in this case with respect to plaintiff D & S Coal Company?

QUESTION NO. 5:

We the jury determine that the defendant's property was increased in value in the amount of $_____ by the work performed by the plaintiff.

QUESTION NO. 6:

We the jury determine that the reasonable cost of accomplishing the work that was done by the plaintiff in reliance upon the promise to lease was $_____.

■ However, the Court made it clear that Question No. 4 was submitted to the jury for an advisory verdict only under Rule 39(c) of the Federal Rules of Civil Procedure. The injustice requirement of promissory estoppel is an equitable consid-

---

**3.** Interestingly enough, the dispute in *Price* involved a coal mining lease very near the location of the dispute in the case at bar. *Price* was decided before the *Restatement (Second) of Contracts,* which added section 139, was published.

**4.** Sections 90 and 139 are two of many estoppel provisions in the *Restatement.* Section 90 is generally used to circumvent the requirement of consideration. Section 139 is used to circumvent the statute of frauds. The two sections are largely identical, but there is one perhaps important difference: section 90 says the remedy "may" be limited as justice requires; section 139, however, says the remedy "is" to be limited as justice requires, which may suggest that section 139 is less flexible and more sparingly applied in keeping with the important policies underlying the statute of frauds. These policies are discussed below.

eration which must ultimately be determined by the Court, not the jury. *R.S. Bennett & Co., Inc. v. Economy Mechanical Industries, Inc.,* 606 F.2d 182 (7th Cir. 1979); *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267 (1965). *See also Tel–Treads, A Div. of Telici, Inc. v. Montgomery Ward & Co., Inc.,* 772 F.2d 908 (table) (6th Cir.1985) (unpublished opinion) (text in Westlaw).

The jury answered "yes" to interrogatories 1 through 4 and set $50,000 as damages in response to Question No. 5 as well as Question No. 6. It is now the responsibility of this Court to make a *de novo* determination as to whether injustice can be avoided only by the enforcement of the promise to lease. In making this determination, the Court is guided by the considerations specified in *Restatement (Second) of Contracts* § 139(2). The Court will consider each of these factors *seriatim:*

(a) *The availability and adequacy of other remedies, particularly cancellation and restitution.*

This factor appears to be concerned with the legal remedies. It does not appear in this case that the plaintiff has other legal remedies although, as will be discussed below, the plaintiff did have a practical remedy which he did not exercise.

(b) *The definite and substantial character of the action in relation to the remedy sought.*

This has to do with the amount of damages to be awarded. As will be discussed below, the Court concludes that the plaintiff is not entitled to recover any damages whatsoever.

(c) *The extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms or otherwise established by clear and convincing evidence.*

The jury in this case determined that the lease promise was made by U.S. Steel.

However, the Court concludes that the evidence in support of this proposition is exceedingly weak, and is certainly not "clear and convincing." It stretches credulity to believe that U.S. Steel had made a promise to lease (or that D & S had agreed on a lease) when neither party had any idea whatsoever whether there was any coal on the property; D & S would have had to pay an advance royalty (amount undetermined) with the execution of any lease; U.S. Steel had no financial data on D & S (which was not even incorporated yet); and U.S. Steel had no evidence of liability insurance coverage from D & S. Moreover, plaintiff's actions in alleged reliance on the promise to lease is more logically referrable to the prospecting permit issued to Mr. Layne.[5]

This is not a case of a corporate giant taking advantage of a poor, innocent individual. If there was a "handshake," there is no evidence that U.S. Steel intended to mislead the plaintiff. *See, e.g., Chromalloy American Corp. v. Universal Housing Systems of America,* 495 F.Supp. 544 (S.D.N.Y.1980), *aff'd,* 697 F.2d 289 (2nd Cir. 1982) (lack of proof that promisor intended to mislead promisee in alleged oral agreement precludes operation of promissory estoppel). Moreover, Mr. Layne, though illiterate, is in many ways very astute and has made a considerable amount of money and has much experience in the coal mining business. The Court concludes that there is substantial evidence that he, as well as U.S. Steel, well knew that the arrangements for any coal lease were far from complete before Mr. Layne began to fix up the road and start his prospecting.

(d) *The reasonableness of the action or forbearance.*

As the Court mentioned above, there is an issue as to whether the alleged lease promise was made by U.S. Steel on March 14th rather than March 27th. However, there is no doubt that the issue must be

---

5. Testimony at trial established that it is the normal custom and practice of the mining industry for a prospecting permit to be issued

*before* any lease to allow the parties to agree to terms, such as minimum royalties.

resolved in favor of the March 27th date. All the travel records of U.S. Steel employees involved in that meeting point to March 27th. Mr. Gary Sides' wife entered the hospital to have a baby in Birmingham, Alabama, on March 14th and Sides' presence there was required. He did not, therefore, attend any meeting in Tennessee on that date.

The significance of all this is that Layne and D & S were charging ahead with their mining activities prior to March 27th. On March 18, 1985, they had contacted an engineering firm to begin taking steps towards obtaining a surface mining permit from the Office of Surface Mining. On March 22, 1985, a representative of this engineering firm came to visit the proposed coal mining area. In taking this action, plaintiff could not have been relying on any promise whatsoever. That the plaintiff was undertaking mining activity even before a promise could possibly have been made leads to the inference that anything which happened on March 27th supplied no additional impetus for the plaintiff to incur expenses in reliance thereon.

The real reason why the deal was never consummated was that Mr. Layne could not block the roads where he wanted to block them. Mr. Layne needed to block access to his mine for security purposes—to protect his equipment and reduce his liability exposure. The Court certainly does not quarrel with this proposition. However, in three full days of trial the plaintiff produced *no* evidence why he could not have secured his mining activity in some other fashion than to block off the public Jones Point and Rankins Lease Roads. For example, a gate on the haul road that Layne built to the proposed mine site where it leaves the Jones Point Road (Point C on Exhibit 52D) about a half mile from the proposed mine site would have easily secured the mining operation. U.S. Steel had no objection to a gate, machine gun, tank or anything else at this location.

It is clear, therefore, that Mr. Layne's efforts on behalf of D & S need not have been in vain. For whatever reason, Mr. Layne let his personal pique get the best of

him. He could have proceeded with his prospecting and protected his equipment and any mining operations. He chose not to do so. In equity, therefore, he cannot be permitted to recover. On balance, his actions were not reasonable.

(e) *The extent to which the action or forbearance was foreseeable by the promisor.*

The matters which relate to this factor are discussed under subparagraph (c) above.

CONCLUSION

The policy behind the statute of frauds is a strong one. The applicable section of the statute of frauds, T.C.A. § 29–2–101 provides in pertinent part:

No action shall be brought: ... (4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a term longer than one (1) year; ... unless the promise or agreement, upon which action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith....

The purpose of the statute of frauds—similar provisions of which are in effect in every state—"is to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other." *Price v. Tennessee Products & Chemical Corp.,* 53 Tenn.App. 624, 385 S.W.2d 301, 308 (1964), and to "guard against misunderstanding as to the nature and extent" of agreements concerning realty, *Ashley and Gibbs v. Preston,* 162 Tenn. (9 Smith) 540, 545, 39 S.W.2d 279 (1931), *quoting Whitby v. Whitby,* 36 Tenn. (4 Sneed) 473, 478 (1857). The statute also "ensures that transactions involving ... realty interests are commemorated with sufficient solemnity ... that the parties and the public can reasonably know when such a transaction occurs." *Seale v. Citizens Sav. & Loan Ass'n,* 806 F.2d 99, 104 (6th Cir.1986) (*quoting North Coast Cookies, Inc. v. Sweet Temptations, Inc.,* 16 Ohio App.3d 342, 476 N.E.2d 388 (1984)). Since realty has historically been considered unique, *see, e.g., Farnsworth on*

*Contracts,* § 12.06 p. 829 (1982), and transactions involving realty invariably involve significant sums of money and potentially effect the actions and interests of third parties, *Seale* at 104, this writing requirement advances important interests, as its longevity indicates.[6]

■ As Tennessee courts have recognized, the statute of frauds exists to prevent fraud, not to perpetrate it. Consequently, the statute may be avoided "under the doctrine of equitable estoppel in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship or oppression, verging on actual fraud." *Baliles v. Cities Service Co.,* 578 S.W.2d 621, 624 (Tenn.1979). The doctrine of promissory estoppel, if it is to be applied, must be applied only to avoid the perpetration of a fraud. *See generally* 73 Am.Jur.2d, *Statute of Frauds* § 562 (1974); *see also Anno., Promissory Estoppel as Basis for Avoidance of Statute of Frauds,* 56 A.L.R.3rd 1037 (1974); *Baliles v. Cities Service Co.,* 578 S.W.2d 621 (Tenn.1979). Here, any proof of fraud on the part of U.S. Steel is decidedly lacking. The Court concludes that this is *not* a case where justice can be avoided only by enforcement of the alleged lease promise. The plaintiff may not avail itself of the doctrine of promissory estoppel in this case. The Court in a separate order will enter judgment for the defendant.

### JUDGMENT

For the reasons expressed by the Court in its memorandum filed herewith, it is ORDERED AND ADJUDGED that the plaintiff, D & S Coal Company, Inc., take nothing, that this action be DISMISSED on the merits, and that the defendant recover of plaintiff D & S Coal Company, Inc. its costs of action.

SO ORDERED.

---

6. The Tennessee statute was originally enacted in 1801. *Price v. Mercury Supply Co., Inc.,* 682