**Jerry STEELMAN, Plaintiff/Appellant,**

v.

**FORD MOTOR CREDIT COMPANY,
A Foreign Corporation,
Defendant/Appellee.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

May 26, 1995.

Application for Permission to Appeal
Denied by Supreme Court
Oct. 30, 1995.

---

1. The record reflects that the defendant filed an    appropriate denial under oath.

Russell W. Savory, Law Offices of William M. Gotten, Memphis, for Plaintiff/Appellant.

Tracey P. Malone, Law Offices of Marr and Malone, Memphis, for Defendant/Appellee.

FARMER, Judge.

The appellant, Jerry Steelman (Steelman), filed suit against the appellee, Ford Motor Credit Company (Ford), to recover money damages in the amount of $116,502.20 plus prejudgment interest. Steelman alleged a breach of contract and, in the alternative, relied upon the theory of promissory estoppel.[1] The trial court directed a verdict in favor of Ford at the close of all proof. The issue on appeal is whether the trial court erred in its determination.

In 1989, Jim Hamby (Hamby) owned three automotive dealerships: Hamby Motor Company, Hamby Pontiac–GMC Truck, and Hamby Ford. Each dealership operated under a wholesale financing and security agreement with Ford, commonly referred to as "floor plan financing." A cross-guarantee agreement existed between Hamby Ford and Hamby Pontiac. After the dealerships began exhibiting financial difficulties, including issuing checks to Ford returned for insufficient funds, Ford suspended the credit lines of all three dealerships. Thereafter, Steelman began negotiating with Hamby to purchase an interest in the Hamby Ford dealership. On September 20, 1989, Steelman paid $90,000 to Ford and Hamby Ford conveyed

---

1. At trial, Steelman relied solely upon this doc- trine as a means to recover.

50% of its outstanding stock to Steelman. The circumstances under which the payment to Ford was made are at issue here.

Steelman testified as follows: Hamby informed him about the floor-plan financing with Ford and that some vehicles had been "sold out of trust." Hamby indicated that this situation would need to be "cleared up" before Ford would extend a line of credit. Steelman then discussed the floor-plan financing agreement with Gerald Thomas, the dealer account manager for Ford, and inquired as to the exact amount due on vehicles sold out of trust and the steps necessary to reinstate the financing. Thomas informed him that the amount due was approximately $88,000 and that, once this amount was paid and the funds for operating expenses were established, Ford would "definitely reinstate the floor plan."[2] On September 20, 1989, Thomas telephoned Steelman, stating that he "had reached a deadline on reinstating the floor plan" and that the amount due on the vehicles sold out of trust had to be paid that day or Ford would close the dealership. Thomas stated that Ford would reinstate the financing once Steelman's checks "cleared the bank." Thomas did not mention the cross-guarantee agreement and never said that he lacked the authority to promise a reinstatement of the financing on behalf of Ford. Steelman described the transaction as follows: "[i]t was pretty much a three-way deal. I was to pay [Ford] $90,000. They were to reinstate the floor-plan financing for Hamby Ford and Hamby Ford was to sign over 50% of the stock in Hamby Ford." Steelman opined that he paid the $90,000 to Ford, not because of any statements made to him by Hamby, but because of his direct dealings with Ford.

In October 1989, Steelman paid an additional $26,501.46 to Ford on behalf of both the Pontiac and Ford dealerships.[3] During this time, Steelman inquired about the status of the financing, to which Thomas replied, "everything was on track and moving, . . . ." In November, Ford informed Steelman of

the cross-guarantee agreement. This information prompted Steelman to write Ford the following letter:

> This letter is to confirm that I purchased 50% of the stock in Hamby Ford Co. in Ripley, TN. When I paid [Ford] money that was due from Hamby Ford, I was told that store would be back on with floor plan. I presently operate a successful business and I see no reason that this store cannot be successful again.

In a post-script, Steelman writes, "[t]his letter in no way obligates me to monies owed by Hamby Pontiac–GMC."

Thomas denies making any promises to Steelman regarding the floor-plan financing. He states that he never informed Steelman that if the payment was made the line of credit would be reopened. According to Thomas, Steelman made the payment merely because he wanted to improve the financial condition of Hamby Ford. Prior to the payment, Thomas informed Steelman that, in order to reinstate the floor-plan financing, he would have to enter into a buy-sell agreement with Hamby and prepare certain required documents for Ford Motor Company, including a financial statement and an application to become a Ford dealer. Thomas did not tell Steelman that the floor-plan financing would remain suspended when payment was made. Thomas never discussed the cross-guarantee agreement with Steelman until after payment of the $90,000.

Steve Larkin, the branch operations manager for Ford, testified that Steelman received the manufacturer's statements of origin for vehicles previously sold by the Ford dealership in exchange for the $90,000 payment. In December 1989, Larkin informed Steelman of the cross-guarantee agreement and they, along with Thomas, discussed the "problems" with the Ford and Pontiac dealerships. Larkin described this meeting as follows:

---

**2.** Steelman testified that the "additional conditions" to reinstate the financing had been met: prior to September 20 he sent a financial statement, dated September 19, 1989, to Ford and had secured the necessary funds for operating the dealership.

**3.** Steelman testified that the additional monies extended were in exchange for titles to vehicles previously sold by either the Ford or Pontiac dealerships.

[Steelman] inquired as to why the floor plan had not been released or reinstated at the Ford dealership since he was now presenting himself as a fifty percent owner in the dealership. And we did at that point tell him that the dealerships were cross guaranteed, that we had to have the situation at the Pontiac store resolved before we could really go back into business with the Ford store ... And [Steelman] at that point told us that [Hamby] told him that paying the SOT amount would reinstate the floor plan for the Ford dealership.[4]

Larkin did not inform Steelman of the cross-guarantee agreement when he paid the $90,000 "[b]ecause I understood that the money was a loan and did not feel that there was any obligation to [Steelman] to divulge that. In fact, felt to some extent that it would be improper for me to divulge that." Larkin informed Steelman of the cross-guarantee agreement only after learning that he had an ownership interest in the Ford dealership.

Ford relies upon the statute of frauds, specifically T.C.A. § 29–2–101(b)(1),[5] as a defense to the present action. Ford asserts that, where the statute of frauds is asserted as a defense, the doctrine of promissory estoppel may only be applied to avoid the perpetration of a fraud. It relies primarily upon *D & S Coal Co. v. USX Corp.*, 678 F.Supp. 1318 (E.D.Tenn.1988), holding to that effect. Ford insists that Steelman failed to prove actionable fraud. Steelman counters that proof of actual fraud is not necessary to recover under the theory of promissory estoppel and that the trial court erroneously granted a directed verdict as all elements necessary to recover under the doctrine were proven. In ruling from the bench, the trial court stated that Steelman failed to carry his burden of proof on the issue of fraud.

The court in *Trew v. Ogle*, 767 S.W.2d 662 (Tenn.App.1988), held that an agreement falling within the statute of frauds is voidable at the instance of either party. *Trew*, 767 S.W.2d at 664. If there is a disaffirmance of the oral agreement by either party, no action can be maintained on the contract, either for specific performance or damages. *Id.* Tennessee courts have previously applied the doctrines of part performance or equitable estoppel to avoid application of the statute of frauds. *See Blasingame v. American Materials, Inc.*, 654 S.W.2d 659 (Tenn.1983) (doctrine of part performance applied to enforce oral employment contract); *Baliles v. Cities Service Co.*, 578 S.W.2d 621 (Tenn.1979) (doctrine of equitable estoppel applied to enforce agreement to sell real estate). Our supreme court, however, refused to apply the doctrine of promissory estoppel as an exception to the statute of frauds in *Southern Indus. Banking Corp. v. Delta Properties, Inc.*, 542 S.W.2d 815 (Tenn.1976).

The foregoing doctrines are utilized by courts to avoid application of the statute of frauds when enforcement of an alleged oral agreement is sought. Of utmost significance in the instant action is the fact that Steelman does not seek enforcement of an alleged oral agreement. Pursuant to his complaint, he merely seeks to recover the funds expended in exchange for the alleged promise by Ford.

■■■ We agree with Ford's contention that the agreement between these parties, if there be one, falls within the statute of frauds. However, this would not preclude Steelman from filing an action to recover the monies paid pursuant to the alleged agreement.

Payments made under a contract unenforceable by reason of the statute of frauds may be recovered back where the other party sets up the statute and declines to perform....

.... So money paid under the contract for the benefit of the repudiating party may be recovered. It is essential to recovery under the rule that the payment made

---

4. Thomas also testified that Steelman made this comment.

5. No action shall be brought against a lender or creditor upon any promise or commitment to lend money or to extend credit, or upon any promise or commitment to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the lender or creditor, or some other person by him thereunto lawfully authorized.

be a part or all of the purchase price, that it shall have inured to the benefit of defendant, that there was a failure of consideration, that plaintiff shall not have received the value of the payments from use and occupation or other benefits, and that defendant shall have refused to perform.

37 C.J.S. *Frauds, Statute of,* § 256 (1943).

■ It is well settled in Tennessee that money paid upon consideration that subsequently fails may be recovered. *See Walker v. Walker,* 3 Tenn.Civ.App. 670, 686 (1913). An action for money had and received is based upon an implied assumpsit. It is properly cognizable in a court of law and may be maintained where one receives money or its equivalent under such circumstances that in equity and good conscience he ought not to retain and in justice and fairness it belongs to another. *Interstate Life & Accident Co. v. Cook,* 19 Tenn.App. 290, 86 S.W.2d 887, 891 (1935).

The issue remaining in this case is whether or not Ford agreed to reinstate the floor-plan financing in exchange for Steelman's payment. The record indicates disputed testimony on this issue. Resolution, therefore, must be determined by a jury who will consider the credibility of the witnesses.

■ A motion for directed verdict is to be granted only when there is no material evidence in the record to support a verdict for the plaintiff under any of his/her proposed theories. *City of Bartlett v. Sanders,* 832 S.W.2d 546, 549 (Tenn.App.1991). Viewing the evidence in the light most favorable to Steelman, we find that a jury could reasonably conclude that his payments to Ford were in exchange for its agreeing to reinstate the financing of the Ford dealership inventory. Should the jury reach this conclusion, Steelman would be entitled to recover the payments made in exchange for such agreement. If, on the other hand, the jury concludes that Ford made no such promise and Steelman's payments were merely an attempt to improve the financial stability of the dealership, Steelman would not be entitled to a recovery.

It results that the judgment of the trial court is reversed and this cause remanded for further proceedings consistent herewith. Costs are taxed to Ford Motor Credit Company, for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.