Patrick BEAUDREAU, et al.

v.

**LARRY HILL
PONTIAC/OLDSMOBILE/GMC, INC.**

Court of Appeals of Tennessee,
at Knoxville.

March 22, 2004 Session.

Sept. 28, 2004.

Permission to Appeal Denied by
Supreme Court March 28, 2005.

Gordon Ball, Knoxville, Tennessee, for the appellant, Patrick Beaudreau, on behalf of himself and all others similarly situated.

William A. Young, John W. Butler, and Jeffrey R. Thompson, Knoxville, Tennessee, for the appellee, Larry Hill Pontiac/Oldsmobile/GMC, Inc.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

This is a class action lawsuit filed by a consumer, Patrick Beaudreau, against a car dealer, Larry Hill Pontiac/Oldsmobile/GMC, Inc. ("Hill Pontiac"). Beaudreau purchased an automobile from Hill Pontiac and the purchase was financed through General Motors Acceptance Corporation ("GMAC").[1] Beaudreau alleges, *inter alia*, that Hill Pontiac violated the Tennessee Consumer Protection Act ("the TCPA") and the Tennessee Trade Practices Act ("the TTPA") in that it failed to reveal to Beaudreau that it had an arrangement with GMAC by the terms of which Hill Pontiac received a portion of the interest rate charged to Beaudreau. The trial court dismissed Beaudreau's claims. Beaudreau appeals. We affirm.

## I.

On April 12, 1999, Beaudreau agreed to purchase an automobile from Hill Pontiac in Sevierville. In order to purchase the vehicle, Beaudreau obtained financing—with the help of Hill Pontiac representatives—through GMAC. The Hill Pontiac representatives informed Beaudreau that the financing would be subject to a per annum interest rate of 13.5%, which Beaudreau accepted. Sometime later, Beaudreau learned that GMAC had quoted Hill Pontiac an interest rate of 11.25% and that Hill Pontiac had added 2.25% to that rate, thus arriving at the 13.5% interest rate. This practice of a car dealer receiving a certain percentage of the financing it arranges for its customers is commonly referred to as the "dealer reserve" or a "dealer participation" agreement.

On March 8, 2000, Beaudreau filed a complaint against Hill Pontiac, alleging that Hill Pontiac's practice of dealer reserve violated the TCPA. As additional grounds, Beaudreau raised the issues of unjust enrichment, money had and received, and civil conspiracy, among others. In his complaint, Beaudreau sought class certification for all Hill Pontiac customers similarly situated.

Hill Pontiac moved (1) to dismiss the complaint for failure to state a claim, or, in

---

**1.** While the contract between Beaudreau and Hill Pontiac is not in the record, the complaint contains allegations clearly reflecting (1) that the transaction was memorialized in a retail installment sales contract between Beaudreau and Hill Pontiac calling for an interest rate of 13.5% and (2) that this contract was negotiated by Hill Pontiac to GMAC.

the alternative, (2) for a more definite statement. The trial court granted the motion for a more definite statement and took the motion to dismiss under advisement.

Beaudreau filed his first amended complaint on April 10, 2001, and two months later, Hill Pontiac renewed its motion to dismiss, alleging that the amended complaint still failed to state a claim. The trial court orally denied the motion, but it did not enter an order memorializing its action. Subsequently, Hill Pontiac filed an answer to the amended complaint, denying that it was liable to Beaudreau under any of his several theories of recovery.

In September, 2002, Beaudreau moved to certify the proposed class of Hill Pontiac customers, and on November 12, 2002, Beaudreau filed a motion requesting permission to file a second amended class action complaint. The trial court held a hearing on Beaudreau's motions on November 14, 2002. At that time, the trial court noted that it had never entered an order denying Hill Pontiac's renewed motion to dismiss. The court went on to state that, after reviewing applicable case law, it had reconsidered its previous ruling. It then granted Hill Pontiac's motion to dismiss. The court did, however, grant the plaintiff's motion to file a second amended complaint. These rulings were confirmed by an order filed January 31, 2003.

On March 20, 2003, the trial court filed a supplement to its previous order, in which it offered an explanation for its rationale in granting the motion to dismiss. Finding that the cases relied upon by Beaudreau were easily distinguishable from his case, and holding that an unpublished California trial court opinion provided good insight, the trial court reasoned that there was nothing unlawful about the practice of dealer reserve.

From this ruling, Beaudreau appeals.

## II.

As previously stated, the trial court granted Hill Pontiac's motion to dismiss Beaudreau's claims. Hill Pontiac's motion was premised on the failure of the complaint to state a claim upon which relief can be granted. *See* Tenn. R. Civ. P. 12.02(6). "Such a motion challenges the legal sufficiency of the complaint." *Trau– Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn.2002). Our role on this appeal is clear. We "must construe the complaint liberally, presum[e] all factual allegations to be true and giv[e] the plaintiff the benefit of all reasonable inferences." *Id.* A complaint should be dismissed only if "it appears that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn.1994). Our review is *de novo* with no presumption of correctness attaching to the trial court's judgment, *Trau–Med*, 71 S.W.3d at 696–97, because the question before us is one of law: Does the complaint state a cause of action?

## III.

The plaintiff raises four issues on appeal, which can be succinctly stated as follows:

1. Did the trial court err in finding that Beaudreau failed to state a cause of action under the TCPA?

2. Did the trial court err in finding that Beaudreau failed to state a cause of action for civil conspiracy?

3. Did the trial court err in finding that Beaudreau failed to state a cause of action under the TTPA?

4. Did the trial court err in finding that Beaudreau failed to state a cause of action for unjust enrichment and/or money had and received?

## IV.

### A.

Beaudreau first asserts that the trial court erred in finding that he failed to state a cause of action under the TCPA. Specifically, Beaudreau claims that Hill Pontiac had a duty to disclose the "real" interest rate, *i.e.*, the 11.25% rate, to him. We disagree.

The TCPA was enacted, in part, "[t]o protect consumers ... from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce ... within this state." Tenn.Code Ann. § 47–18–102(2) (2001). Beaudreau alleges that Hill Pontiac's practice of "secretly inflating the real interest rates consumers are charged when financing their car purchases" is a deceptive practice under the meaning of the TCPA and is thus unlawful. (Emphasis in original omitted). *See* Tenn.Code Ann. § 47–18–104(b)(27) (Supp.2003) (stating that engaging in an act that is deceptive to the consumer is unlawful). In support of his position, Beaudreau points to the following allegations in his second amended complaint:

During the course of the transaction, [Beaudreau] was told by Hill Pontiac representatives that financing for him could and would be arranged by Hill Pontiac through GMAC "at the lowest rates offered" by GMAC. Financing of [Beaudreau's] vehicle was ultimately provided by GMAC. When the Hill Pontiac representative, who at all times was acting as [Beaudreau's] agent, returned with what he characterized as "the best rate they could give us," [Beaudreau] believed he had negotiated the "best rate" with GMAC on his behalf.

However, Hill Pontiac secretly, and without [Beaudreau's] knowledge, added 2.25 percentage points to [Beaudreau's] real interest rate (consequently arriving at the 13.50% rate). [Beaudreau] was specifically told by Hill Pontiac representatives, including the salesman and finance department personnel, that Hill Pontiac had dealt with GMAC on [Beaudreau's] behalf and that the 13.50% rate was the best rate GMAC could offer. However, Hill Pontiac knew GMAC had agreed to finance [Beaudreau's] purchase at a rate lower than 13.50%, which would have consequently led to lower monthly payments.

[Beaudreau] was never told and did not understand that Hill Pontiac was going to receive any of the 13.5% interest rate that he was charged. The real interest rate was never disclosed to [Beaudreau]. Specifically, [Beaudreau] also did not know that the interest rate at which the automobile was financed—and which he paid—was *secretly* inflated by and for the economic benefit of Hill Pontiac by utilizing the dealer reserve scheme described herein.

GMAC arranges for its automobile dealers to act as intermediaries between the consumer and GMAC in order to finance the sale of automobiles. This arrangement is set out in a "dealer participation" agreement between Hill Pontiac and GMAC. According to the agreement between GMAC and Hill Pontiac, the dealership is specifically authorized by GMAC to overcharge consumers by inflating the interest rate charged.

(Numbering in original omitted) (emphasis in original).

This is an issue of first impression in Tennessee. While the issue of dealer reserve was involved in the case of *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351 (Tenn.Ct.App.2001), that case centered solely on the issue of an arbitration agreement; the issue of whether the practice of dealer reserve violated the TCPA was never reached. Beaudreau relies upon the unreported case of *Adkinson v. Harpeth Ford–Mercury, Inc.*, No. 01A01–9009–

CH00332, 1991 WL 17177 (Tenn.Ct.App. M.S., filed February 15, 1991), in which the concept of dealer reserve, among many other issues, was involved. In *Adkinson*, the court made the following finding with respect to dealer reserve:

> We are also of the opinion that *under the circumstances* it was proper for the jury to base a finding of unfair or deceptive acts and practices on the evidence at trial which shows that Harpeth kept for itself 2.5% of the 16.5% annual percentage rate financing which plaintiff was led to believe was charged by [Ford Motor Credit Company] to finance the transaction. Harpeth told plaintiff that FMCC was financing the transaction but failed to disclose to plaintiff that it had secretly imposed the 2.5% additional charge.

*Id.*, at *7 (emphasis added). Relying upon this language, Beaudreau advances the position that the Court of Appeals has "specifically held that the practice [of dealer reserve] ... violates the TCPA." However, Beaudreau overlooks the limiting language of "under the circumstances." In *Adkinson*, the court found evidence of oral misrepresentations that induced the plaintiff into signing a written contract, as well as evidence that the dealership "used high-pressure tactics" to pressure the plaintiff into purchasing a car when she simply wanted to pay off her lease of the vehicle. *Id.* Based upon these events, the court went on to find that "[t]here is substantial material evidence that Harpeth engaged in unfair or deceptive acts or practices under the [TCPA] and that it also made negligent misrepresentations to plaintiff." *Id.* The court did state that the jury could have based its findings on the "deceptive act" of dealer reserve—*under the circumstances* of the case, which included numerous acts which were clearly deceptive under the TCPA. *Id.* Indeed, this court has previously interpreted this language to mean that "a dealer's failure to disclose

'dealer reserve' was actionable *when the dealer engaged in a pattern of deceptive conduct.*" *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn.Ct.App.1999) (emphasis added). By contrast, there are no allegations of such deceptive or misleading acts in the instant case—the only allegation is that Hill Pontiac engaged in the practice of dealer reserve. We find that the facts in *Adkinson* are distinguishable from those in the case at bar. Accordingly, we conclude that *Adkinson* does not have precedential value in the instant case.

Beaudreau also relies upon another unreported case, *Baggett v. Crown Auto. Group, Inc.*, No. 01A01–9110–CV00401, 1992 WL 108710 (Tenn.Ct.App. M.S., filed May 22, 1992), to support his position that the practice of dealer reserve is unlawful. This case contains evidence of the dealership engaging in egregious fraudulent conduct, which included the dealership making alterations to the original sales contract without the plaintiff's knowledge. *Id.*, at *7. When the plaintiff signed the sales contract on the purchase of his automobile, he agreed to an annual percentage rate of 14.75%. *Id.*, at *3. However, when the dealership realized that Ford Motor Credit Company was not going to approve the financing on the terms agreed upon by the plaintiff and the dealership, the dealership unilaterally increased the annual percentage rate to 15.3% in order to obtain the financing. *Id.*, at *3–*5. The dealership then induced the plaintiff's wife to sign a new contract, in the absence of the plaintiff, without telling her of the changes in the contract. *Id.*, at *4–*5. This court held that increasing the interest rate without informing the plaintiff constituted an unfair or deceptive act as contemplated by the TCPA. *Id.*, at *10. However, the actions by the dealership in increasing the rate of interest in the *Baggett* case do not constitute the practice of dealer reserve

such as we have in the instant case. Further, as in *Adkinson*, the actions of the dealership in *Baggett* were clearly deceptive, as well as fraudulent. We have no such conduct in the case at bar.

The only other instance in which dealer reserve has been addressed in Tennessee is in the case of *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273 (Tenn.Ct.App. 1999), in which we held that the plaintiff's complaint did not state a cause of action against Ford Motor Credit Company for a violation of the TCPA, based upon the practice of dealer reserve. *Id.* at 276. Because the plaintiff filed suit against the automotive financing company only and not the dealership involved, we did not reach the issue of the dealership's liability, if any, for engaging in the practice of dealer reserve. *Id.* However, in our opinion on Harvey's petition for rehearing, this court held as follows:

> Although the Amended Complaint alleges that the plaintiff was "required to pay hidden fees," he was clearly informed of the total interest rate, which he was free to accept or reject. Regardless of how payment was allocated between the dealer and defendant, the plaintiff was aware of what his overall payment and total interest rate would be.

*Harvey v. Ford Motor Credit Co.*, No. 03A01–9807–CV–00235, 1999 WL 486894, at *2 (Tenn.Ct.App. E.S., filed July 13, 1999). The court went on to point out that the plaintiff was "free to seek financing from other sources." *Id.* There is no allegation in the instant case that Hill Pontiac prevented Beaudreau from considering other financing options.

Because there is no case that is squarely on point in Tennessee, we have looked to the case law outside of our jurisdiction for guidance. While our research has revealed that only a handful of jurisdictions have addressed the legality of dealer reserve, the cases in those jurisdictions are indeed instructive.

The United States Court of Appeals for the Seventh Circuit addressed the issue of dealer reserve in the context of the plaintiff's allegation that the dealership was acting as his agent when it arranged the financing:

> [A]n automobile dealer is not its customers' agent, obviously not in selling cars but only a little less obviously in arranging financing. If the buyer pays cash and arranges his own financing, the dealer is not in the picture at all. If the buyer wants to buy on credit, he recognizes that his decision does not change the arms' length nature of his relation to the dealer. He knows, or at least has no reason to doubt, that the dealer seeks a profit on the financing as well as on the underlying sale.

> \* \* \*

> [T]here is no suggestion that the dealer here represented that he would act as the buyer's agent in dealing with the finance company, no indication therefore that an agency relationship was created. If there were such a relationship it would mean that the buyer could tell the dealer to shop the retail sales contract among finance companies and to disclose the various offers the dealer obtained to him, and no one dealing with an automobile dealer expects that kind of service.

*Balderos v. City Chevrolet*, 214 F.3d 849, 853–54 (7th Cir.2000).

The Alabama Supreme Court adopted similar reasoning when it addressed the issue of dealer reserve:

> Although this case specifically involves lenders and interest rates, interest is nothing other than the cost or price of borrowing money. The [dealer reserve] agreement at issue here is nothing more than [the dealership's] profit on the loan

transaction, which had a wholesale price and a retail price. We decline to recognize a common law duty that would require the seller of a good or service, absent special circumstances, to reveal to its purchaser a detailed breakdown of how the seller derived the sales price of the good or service, including the amount of profit to be earned on the sale.

*Ex parte Ford Motor Credit Co.*, 717 So.2d 781, 787 (Ala.1997) (internal citation omitted).

Finally, the California Court of Appeal has made the following statements with respect to the legality of dealer reserve:

The [plaintiffs] effectively assert that payment of the dealer reserve is deceptive merely because it is not disclosed to consumers. However, disclosure is not required by law, and indeed the Federal Reserve Board long ago rejected the proposition that such disclosure would be useful to consumers.[2] Moreover, the [plaintiffs] allege no facts suggesting why a reasonable person would believe that the financing rate in his or her contract with the dealer is the same rate at which a lender would make a direct loan. Indeed, a reasonable person would likely believe the opposite; the Federal Reserve Board thought so, and several courts have agreed.... Accordingly, we conclude payment of the dealer reserve as alleged in the complaints does not constitute a fraudulent business practice.

* * *

The claim that consumers pay higher interest rates than they would if no dealer commission existed may be true, but that is scarcely unfair. Dealers, like any other retailer, seek a profit on the credit services they provide. We are compelled to agree with [the defendant] that the "unfair" prong of the unfair competition law was not intended to eliminate retailers' profits by requiring them to sell at their cost, whether the product is automobiles or automobile financing. In short, we discern no offense to public policy, and no unfairness to be weighed. Payment of the dealer reserve is not an unfair practice under the unfair competition law.

*Kunert v. Mission Fin. Servs. Corp.*, 110 Cal.App.4th 242, 1 Cal.Rptr.3d 589, 606–607 (2003) (internal citations omitted); *see also Geller v. Onyx Acceptance Corp.*, No. 728614, 2001 WL 1711313, at *2, *6 (Cal. Superior, filed November 13, 2001) (noting that the practice of dealer reserve has been "an integral part of the indirect auto finance market since at least the 1960's" and finding that dealer reserve does not constitute an unfair or deceptive business practice).

■ We find the approach to dealer reserve followed by these other jurisdictions

---

**2.** At this point in the opinion, the California court refers the reader to an earlier footnote, which states as follows:

In 1977, the Federal Reserve Board issued a decision interpreting Regulation Z (12 C.F.R. Part 226), which implemented the federal Truth in Lending Act. The Board ruled that a dealer participation need not be identified or disclosed in Truth in Lending disclosures as a separate component of the finance charge. At the same time, the Board withdrew a proposal that would have required separate disclosure of the existence, but not the amount, of a dealer participation. The Board concluded that disclosure of the total finance charge and widespread advertisement of credit terms afforded consumers "the most important information with which to comparison shop for credit." Also, the Board believed the addition of another disclosure requirement would result in more complex disclosure statements and could lead to confusion or misunderstanding by consumers. (42 Fed. Reg. 19124–19125 (Apr. 12, 1977).)....

*Kunert*, 1 Cal.Rptr.3d at 599 n. 10.

to be well-reasoned and adopt it as our own. Each of the aforementioned cases holds, in essence, that a reasonable consumer should be aware that a for-profit retailer, in arranging for financing for a consumer, would expect to receive some sort of remuneration for its efforts; that the consumer is free to seek financing elsewhere if he or she is unhappy with the terms quoted by the dealer; that the practice of dealer reserve need not be disclosed to the consumer, as previously found by the Federal Reserve Board; and that the practice of dealer reserve is in no way unlawful. It appears that this court was contemplating a similar reasoning in *Harvey*, when it noted that the plaintiff was "free to accept or reject" the quoted interest rate and that the plaintiff was no doubt aware of the total payment and interest rate. *Harvey*, 1999 WL 486894, at *2.

There is no factual predicate in the complaint before us which gives rise to a legal duty on Hill Pontiac to disclose to the plaintiff that it is to receive a portion of the interest charged by GMAC. The plaintiff was aware that his contract called for interest at the rate of 13.5% per annum. There is nothing in the complaint indicating that this information or the amount of his monthly payment was hidden from him. Regardless of whether GMAC was to receive all or only a portion of the stated interest of 13.5%, the fact remains that the plaintiff knew that he was paying 13.5% interest to borrow the money to finance the purchase of his car. He was, at all times, free to reject GMAC financing and look elsewhere for a loan to pay for his vehicle.

Accordingly, we find, in the instant case, that Hill Pontiac's dealer participation agreement with GMAC does not constitute a deceptive act or practice and that Hill Pontiac had no duty to disclose the existence of the agreement to Beaudreau. We conclude that the practice of dealer re-

serve, standing alone, does not violate the TCPA.

### B.

Beaudreau next contends that the trial court erred in finding that he had not stated a cause of action for civil conspiracy. A civil conspiracy is a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn.2001) (quoting *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344, 353 (1948)). In the case at bar, Beaudreau alleges that Hill Pontiac conspired with GMAC to "purposely conceal the practice by which Hill Pontiac is paid a 'kickback' by [GMAC and other lenders]." Because we hold that the practice of dealer reserve does not have "an unlawful purpose" or constitute the accomplishment of a lawful purpose "by unlawful means"—an essential element of a civil conspiracy claim—we find this issue to be without merit.

### C.

Next, Beaudreau argues that the trial court erred in finding that he failed to state a claim under the TTPA. With respect to this issue, Beaudreau specifically asserts that Hill Pontiac conspired with lenders "to lessen competition and/or to advance the costs of auto financing."

The TTPA provides, in pertinent part, as follows

All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of *articles* imported into this state, or in the manufacture or sale of *articles* of domestic growth or of domestic raw material, and all arrangements,

contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such *product or article,* are declared to be against public policy, unlawful, and void.

Tenn.Code Ann. § 47–25–101 (2001) (emphasis added).

Despite Beaudreau's attempts to argue that Hill Pontiac provided a product when it arranged the financing for Beaudreau's automobile, the transaction at issue clearly involves a service. This court has previously held that the TTPA is not applicable to workers' compensation insurance premiums, "which [are] an intangible contract right or service" rather than a product or article. *Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.,* 13 S.W.3d 365, 373 (Tenn.Ct.App.1999); *see also McAdoo Contractors, Inc. v. Harris,* 222 Tenn. 623, 439 S.W.2d 594, 597 (1969) (holding that the TTPA does not apply to the award of a building construction contract). Likewise, the arranging of financing constitutes a service, not a product. We therefore hold that the TTPA has no applicability in the instant case. Furthermore, even if the arranging of financing was deemed to fall under the purview of the TTPA—and we do not believe that it does—we find that the practice of dealer reserve is not an arrangement made to lessen "full and free competition," as contemplated by the statute.

## D.

■ Finally, Beaudreau contends that the trial court erred in finding that he had not stated a cause of action for unjust enrichment and/or money had or received. We disagree.

■ In order to recover under a theory of unjust enrichment, the plaintiff must prove the following:

A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

*Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 155 (1966). While the first two prongs of this test have been satisfied, Beaudreau cannot prove that it would be inequitable for Hill Pontiac to retain the 2.25% dealer reserve commission. Indeed, as discussed earlier in this opinion, a consumer cannot expect a dealership to assist that consumer in obtaining financing without receiving some sort of payment for its services. Under the circumstances, we cannot say that it was inequitable for Hill Pontiac to retain the 2.25% dealer reserve.

With respect to the claim of money had and received, such an action "may be maintained where one receives money or its equivalent under such circumstances that in equity and good conscience he ought not to retain and in justice and fairness it belongs to another." *Steelman v. Ford Motor Credit Co.,* 911 S.W.2d 720, 724 (Tenn.Ct.App.1995) (citing *Interstate Life & Accident Co. v. Cook,* 19 Tenn.App. 290, 86 S.W.2d 887, 891 (1935)). Again, we find that there is nothing inequitable in allowing Hill Pontiac to retain the dealer reserve. Accordingly, Beaudreau's claims for unjust enrichment and money had and received must fail.

## V.

Hill Pontiac raises two issues, asserting further bases for upholding the trial court's judgment. Specifically, Hill Pontiac asserts that (1) the transaction in question was in full compliance with the Truth In Lending Act; and (2) the transaction in question complied with the statutes gov-

erning retail installment sales contracts and the sale of commercial paper. We have looked at these matters in a cursory fashion, but as we have previously found that the issues raised by Beaudreau are dispositive of this appeal, we do not need to reach Hill Pontiac's issues. Accordingly, we will not address them.

## VI.

The judgment of the trial court is affirmed. This case is remanded to the circuit court for collection of costs assessed below, pursuant to applicable law. Costs on appeal are taxed to the appellant, Patrick Beaudreau.