[No. B157019. Second Dist., Div. Eight. July 7, 2003.]

JON L. KUNERT et al., Plaintiffs and Appellants, v.
MISSION FINANCIAL SERVICES CORPORATION, Defendant and
Respondent.

ANGELA HICKS et al., Plaintiffs and Appellants, v.
CONSUMER PORTFOLIO SERVICES, Defendant and Respondent.

CATHY DARNOLD et al., Plaintiffs and Appellants, v.
THE MONEY STORE AUTO FINANCE, INC., Defendant and Respondent.

## COUNSEL

R. Rex Parris Law Firm, R. Rex Parris, James S. Kostas; Marlin & Saltzman, Stanley D. Saltzman, Louis M. Marlin; Mazursky, Schwartz & Angelo, Arnold W. Schwartz and Mark D. Bradley for Plaintiffs and Appellants.

Severson & Werson, Jan T. Chilton, Donald J. Querio; Foell & Elder and William N. Elder, Jr., for Defendant and Respondent Mission Financial Services Corporation.

Prenovost, Normandin, Bergh & Dawe, Michael G. Dawe and Thomas J. Prenovost, Jr., for Defendant and Respondent Consumer Portfolio Services.

Anglin, Flewelling, Rasmussen, Campbell & Trytten, Robin C. Campbell and Mark T. Flewelling for Defendant and Respondent The Money Store Auto Finance, Inc.

Musick, Peeler & Garrett, Charles E. Slyngstad and Peter T. Haven for California Motor Car Dealers Association as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

## BOLAND, J.—

### SUMMARY

This case involves the legality of arrangements under which consumers purchase automobiles on credit through conditional sale contracts with automobile dealers. The dealers assign the contracts to finance companies, and the finance companies pay the dealers a portion of the finance charges (called a "dealer participation" or "dealer reserve") due under the assigned contract.

The consumers in this case assert that payment of the dealer reserve by the finance companies to the dealers is (a) a "commission or other remuneration" prohibited by the Rees-Levering Motor Vehicle Sales and Finance Act (hereafter Rees-Levering Act or Rees-Levering); (b) a secret payment injurious to competition that violates the Unfair Practices Act; and (c) an unlawful, unfair and fraudulent business practice under the unfair

competition law. We conclude payment of the dealer reserve does not violate the Rees-Levering Act and is not unlawful under the other statutory provisions at issue. Accordingly, we affirm the judgment of the trial court.

## FACTUAL, LEGAL AND PROCEDURAL BACKGROUND

Several lawsuits were filed, beginning in May 2000, by buyers against numerous automobile dealerships (dealers) and financial institutions (lenders) in the State of California. The lawsuits challenged the legality of the "dealer reserve" or "dealer participation" paid by the lender to the dealer when the dealer assigns a conditional sale contract between the buyer and the dealer to the lender. After preliminary rulings on various conspiracy and misjoinder claims, the trial court was left with a series of similar representative actions against various individual lenders. The lenders filed joint demurrers, and the trial court sustained the demurrers without leave to amend. Notices of appeal were filed from the judgments dismissing three of the cases, which have been consolidated for purposes of appellate review.

We first outline the statutory scheme governing automobile financing transactions, and then describe the allegations in the lawsuits and the trial court's decision.

### 1. *Statutory background.*

The Rees-Levering Act became effective in 1962, and was designed to provide comprehensive protection to purchasers of motor vehicles. The statute, which is codified as amended in Civil Code sections 2981 through 2984.4, defines and governs conditional sale contracts. Its objective is to protect purchasers against excessive charges by requiring full disclosure of all items of cost. All terms must be set forth in a single document, a maximum interest rate applies, and security is limited to the motor vehicle purchased, among other requirements. The extensive formalities and requirements prescribed by the statute for conditional sale contracts are mandatory, and a contract that does not substantially conform to the requirements is unenforceable. (*Hernandez v. Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 69–70 [164 Cal.Rptr. 279].)

A conditional sale contract is a credit sale, not a loan of money. California law has long distinguished between credit sales and loans. Loans are subject to constitutional and statutory provisions on usury; a bona fide credit sale is not subject to the usury law, because a credit sale does not involve a loan or forbearance of money. (*Boerner v. Colwell Co.* (1978) 21

Cal.3d 37, 45 [145 Cal.Rptr. 380, 577 P.2d 200].)[1] Consumer laws such as Rees-Levering, which among other things set limitations upon finance charges, "constitute … a recognition that, whatever the rational weaknesses of the distinction on which it is based, practical considerations of significant moment justify the regulation of credit sales by a means more flexible than that provided by the usury laws." (*Id.* at p. 46.)

Accordingly, a direct or personal loan independently negotiated between an automobile buyer and a third-party financial institution is not governed by the Rees-Levering Act. Rees-Levering, however, does govern the circumstances under which dealers may assist buyers in obtaining such loans. The circumstances are codified in Civil Code section 2982.5, the Rees-Levering provision at issue. The pertinent principles in section 2982.5, and case law interpreting it, are these:

—Subdivision (a) of section 2982.5 expressly provides that direct loans between a motor vehicle purchaser and a "supervised financial organization"—other than the seller of the vehicle—are not affected by or subject to the requirements of the Rees-Levering Act. (Civ. Code, § 2982.5, subd. (a).)[2]

—Subdivision (b) governs the circumstances under which the seller may assist the buyer in obtaining a loan, known in the industry as a side loan, that covers "a part or all of the down payment or any other payment on a conditional sale contract …." (Civ. Code, § 2982.5, subd. (b).) The seller may assist the buyer in obtaining a side loan if several conditions are met. They include a prohibition on the seller receiving "any commission or other remuneration" for assisting the buyer to obtain the loan. (*Ibid.*)[3]

---

[1] This principle "lies at the foundation of consumer and commercial credit sales practices in this country, the massive finance industry which has grown up to service and facilitate those practices, and the body of statutory law which has been enacted to regulate the process for the common good." (*Boerner v. Colwell Co., supra*, 21 Cal.3d at p. 46, fn. omitted.)

[2] The exemption states: "Nothing contained in this chapter [the Automobile Sales Finance Act] shall be deemed to affect a loan, or the security therefor, between a purchaser of a motor vehicle and a supervised financial organization, other than the seller of the motor vehicle, all or a portion of which loan is used in connection with the purchase of a motor vehicle. As used herein 'supervised financial organization' means a person organized, chartered, or holding a license or authorization certificate under a law of this state or the United States to make loans and subject to supervision by an official or agency of this state or the United States." (Civ. Code, § 2982.5, subd. (a).)

[3] The conditional sale contract must state "on its face the amount of the loan, the finance charge, the total thereof, the number of installments scheduled to repay the loan and the amount of each installment, that the buyer may be required to pledge security for the loan, which security must be mutually agreed to by the buyer and the lender and notice to the buyer in at least eight-point type that he or she is obligated for the installment payments on both the conditional sale contract and the loan." (Civ. Code, § 2982.5, subd. (b).) The seller may not provide any security or other guarantee of payment on the loan, "nor shall the seller receive

—In 1980, *Hernandez v. Atlantic Finance Co., supra,* 105 Cal.App.3d 65, held that Civil Code section 2982.5, subdivision (a), exempting direct loans between the buyer and a supervised financial organization from Rees-Levering requirements, was designed to exempt only private financing obtained independently by the purchaser, without involvement of the seller. (105 Cal.App.3d at pp. 70, 77.) Thus, a "seller-assisted personal loan" from a lender for the full purchase price of the automobile was held subject to the Rees-Levering Act. (*Id.* at pp. 75–76.) *Hernandez* observed that while a literal interpretation of the subdivision (a) exemption for loans would exclude seller-assisted loans from coverage, "such an interpretation would render the Rees-Levering Act virtually impotent."[4] (*Id.* at p. 76.)

—In response to *Hernandez,* the Legislature in 1983 added subdivision (d) to Civ. Code section 2982.5 to .govern dealer-assisted automobile loans. Subdivision (d) expressly permits the seller to assist the buyer to obtain a loan from a third party to be used to pay "for the full purchase price, or any part thereof, of a motor vehicle ...." In such a case, however, several other provisions apply. (Civ. Code, § 2982.5, subd. (d)(1)–(6).) These include several of the key protections Rees-Levering requires in conditional sale contracts,[5] as well as a provision that the seller may not receive "any commission or other remuneration for assisting the buyer to obtain the loan."[6] (*Id.,* subd. (d)(5).)

With this background, we turn to the allegations in this case.

---

any commission or other remuneration for assisting the buyer to obtain the loan." (*Ibid.*) If the buyer obligates himself to purchase the vehicle, or receives possession of the vehicle, before securing the loan, and the buyer is then unable to secure the loan on the conditions stated in the conditional sale contract, the conditional sale contract is deemed rescinded. (*Ibid.*)

[4] The court observed that when a purchaser obtains a personal loan, "numerous provisions of the Rees-Levering Act are not complied with." (*Hernandez v. Atlantic Finance Co., supra,* 105 Cal.App.3d at p. 75.) Thus, for example, when a transaction is a loan, interest may be charged which exceeds the maximum allowed under Rees-Levering; mandatory disclosures need not be made to the buyer; additional security may be taken to assure repayment of the loan; and more than one document may be used in connection with the sale and loan. (*Ibid.*) In *Hernandez,* the dealer assisted with the loan from the finance company by filling in a credit application form for the buyer, repeatedly calling the buyer to urge her to complete the transaction, coming to the buyer's home, and driving her to the dealership and then to the lender's office to sign the loan papers. (*Id.* at p. 73.) The loan from the financing company required the buyer to put up both her furniture and the automobile as security for the loan, and did not comport with other requirements imposed on conditional sale contracts under the Rees-Levering Act. (*Ibid.*)

[5] Among the provisions applicable to this type of seller-assisted loan are requirements that the loan may not be secured by a lien on real property, and that the lender is subject to all claims and defenses the buyer could assert against the seller. In addition, Rees-Levering Act provisions on repossession, default, reinstatement and the like (Civ. Code §§ 2983.2, 2983.3, & 2984.4) apply to the loan. (Civ. Code, § 2982.5, subd. (d)(1)–(4).)

[6] The restriction on the seller's receipt of "any commission or other remuneration" applies only "[i]f the buyer becomes obligated to purchase, or receives possession of, the motor vehicle prior to obtaining the loan ...." (Civ. Code, § 2982.5, subd. (d)(5).) However, such circumstances are apparently the norm. Mission Financial expressly states that seller-assisted

## 2. *The lawsuits and the trial court's decision.*

The complaints are addressed to "dealer-assisted financing transactions," defined in the complaints as transactions in which the dealer assists the buyer in obtaining financing from a lender suggested by the dealer. In these transactions, the lender quotes the dealer a rate at which the lender is willing to make the loan, known as the "buy rate." The dealer adds "a commission or up-charge" resulting in the "sell rate," which is the actual cost of the financing as ultimately presented by the dealer to the consumer in the conditional sale contract. The complaints allege the dealer and lender agree, without the consumer's knowledge, that the lender will pay all or some portion of the difference between the buy and sell rates—the "dealer reserve"—to the dealer when the dealer assigns the contract to the lender.

The plaintiffs, to whom we refer collectively as the Kunerts,[7] allege that the lenders' practice of paying the dealer reserve or dealer participation is an unlawful business practice under Business and Professions Code section 17200, because it is an improper "commission or other remuneration" in violation of subdivision (b) of Civil Code section 2982.5. The Kunerts also claim the practice is an unfair and fraudulent business practice under Business and Professions Code section 17200. In addition, the complaints allege that the dealer reserve constitutes a secret payment injurious to competition under Business and Professions Code section 17045. The Kunerts sought restitution and disgorgement, a permanent injunction prohibiting the payment of any "commission or other remuneration" in any seller-assisted financing transaction, costs and attorneys fees, and actual and treble damages.

The lenders (collectively, Mission Financial) filed a joint demurrer, and the trial court sustained the demurrer without leave to amend. The court pointed out that Civil Code section 2982.5, subdivision (b), on its face applies only to claims involving two transactions, a conditional sale contract and a loan. Since the Kunerts' allegations were "squarely predicated on a single-transaction theory"—the theory that the conditional sale contract and its assignment to the lender in effect constituted a single seller-assisted loan by the lender to the buyer—the transactions did not fall within the provisions of section 2982.5, subdivision (b). The court also concluded that (1) the purported secret

---

loans are exempt from Rees-Levering under subdivision (d) only if there is compliance with the specified provisions of Rees-Levering and no payment of a commission to the seller.

[7] The lead case on appeal is *Kunert v. Mission Financial Services Corporation*, brought by Jon and Mary Kunert individually and on behalf of similarly situated members of the general public. The latter are described as all persons who purchased a motor vehicle financed by Mission Financial by "dealer-assisted financing" whose transaction contained a dealer reserve during the period January 1, 1980 to the present. The other two cases are styled as class actions and are brought by Angela Hicks against Consumer Portfolio Services, and by Cathy Darnold against The Money Store Auto Finance, Inc.

payments did not violate Business and Professions Code section 17045 because that section forbids secret payments to purchasers, and the dealers were sellers, not buyers, in the dealer-lender transaction, and (2) the unfair competition claims failed because they rested on the rejected contention the dealer reserve was illegal under Civil Code section 2982.5.

Judgments were entered in favor of the lenders and these appeals followed.

## DISCUSSION

This case requires us to determine first whether the financing transactions described in the complaints are dealer-assisted loans—in which case the commission paid to the dealer is prohibited by Rees-Levering—or bona fide conditional sale contracts followed by assignments to the lenders—in which case the commission is not prohibited by Rees-Levering. California law clearly distinguishes between loans and bona fide credit sales, and allows financial institutions to shape and facilitate a credit sale between buyer and seller without transforming the transaction into a loan. (*Boerner v. Colwell Co., supra*, 21 Cal.3d 37.) Accordingly, we perceive no basis to conclude that the transactions are actually loans rather than conditional sale contracts, or that the transactions are structured to evade the consumer protections provided in the Rees-Levering Act.[8] Moreover, we do not discern any violation of the Unfair Practices Act or the unfair competition law. We consider the various contentions of the Kunerts seriatim.

A. *Payment of a commission by the lender to the dealer in the financing transactions described in the complaint does not violate the Rees-Levering Act.*

The essence of the Kunerts' complaint is that the financing transactions in question are not, as the lenders claim, bona fide conditional sale contracts between the dealers and their customers, followed by valid assignments in which the dealers merely retain a portion of the finance charge. The Kunerts contend the conditional sale contracts and assignments are "sham transactions," jointly controlled by the lender and dealer for the purpose of evading the Rees-Levering prohibition on the payment of commissions in dealer-assisted loan transactions. They cite the *Hernandez* holding—that dealer-assisted loans for the full purchase price were subject to Rees-Levering—to support the proposition that Civil Code section 2982.5, subdivision (b)

___

[8] This opinion should not be read as granting an imprimatur to all dealer-lender transactions involving conditional sale contracts and assignments. There may be circumstances under which the bona fides of particular arrangements could reasonably be questioned. We hold only that in the circumstances alleged in these complaints, payment of the dealer reserve does not violate the Rees-Levering Act or the other statutory provisions at issue.

prohibits payment of commissions on dealer-assisted full loans as well as side loans. Moreover, the Kunerts contend, the question whether a transaction operates to evade a consumer protection statute is a question of fact that should not be resolved on demurrer. The Kunerts' analysis is erroneous on all points.

1. *Section 2982.5, subdivision (b)'s prohibition on commissions on dealer-assisted loans applies only to side loans.*

The complaints allege that payment of the dealer reserve violates Civil Code section 2982.5, subdivision (b). The provision, which has been a part of the statute since 1968, prohibits the dealer from receiving a commission or other remuneration "for assisting the buyer to obtain the loan." ■ The "loan" to which it refers, however, is plainly the type of loan referred to in industry terminology as a "side" or "pickup" loan. Subdivision (b) expressly allows the seller to assist the buyer to obtain a loan that will be used "as a part or all of the downpayment or any other payment on a conditional sale contract" or purchase order. The provision clearly contemplates both a conditional sale contract secured by the vehicle *and* a loan from a third party "upon any security ...." (Civ. Code, § 2982.5, subd. (b).) Subdivision (b) requires the conditional sale contract to set forth various items of information about the loan, including notice to the buyer that he or she is obligated "for the installment payments on both the conditional sale contract and the loan." (*Ibid.*) In short, it is not possible to read the provision as applying to anything other than side or pickup loans. (See *Hernandez v. Atlantic Finance Co., supra*, 105 Cal.App.3d at pp. 76–77 [subdivisions (b) and (c) authorize, but severely restrict, the practice of sellers arranging for financing of a "pickup" payment, which is "the difference between the down payment offered by the purchaser and the amount of down payment required by the seller"; the Legislature "has carefully proscribed the circumstances under which such a seller-assisted side loan may be procured"].)

The Kunerts contend that interpreting subdivision (b) to apply only to side loans "would frustrate the policy embodied in Rees-Levering of protecting consumers against financing arrangements controlled jointly between lenders and dealers." We disagree for two reasons. First, after the *Hernandez* decision, the Legislature amended the Rees-Levering Act, to expressly state the circumstances under which the dealer may assist the buyer in obtaining a loan from a third party for use in paying the full purchase price of a motor vehicle. (Civ. Code, § 2982.5, subd. (d).) ■ Accordingly, no reason exists to interpret subdivision (b) to apply to such loans, as they are expressly governed elsewhere, in subdivision (d). Second, as we discuss in part A.2.b. *post*, the Kunerts' interpretation would reduce, rather than enhance, the consumer protections Rees-Levering was designed to provide.

The complaints allege only a violation of subdivision (b), and the trial court ruled accordingly. On appeal, the Kunerts assert that payment of the dealer reserve is unlawful under both subdivisions (b) and (d). The latter, as we have seen, governs dealer-assisted loans for the full purchase price of the vehicle.[9] Since the complaints could be amended to allege a violation of subdivision (d), we proceed to consider the remainder of the Kunerts' contentions.

> 2. *Conditional sale contracts and assignments are not "sham transactions" designed to evade the Rees-Levering prohibition on the payment of commissions on dealer-assisted loans.*

The Kunerts contend the lenders "avoid doing business in the form of direct loans between the [lenders] and buyers." Instead, they use conditional sale contracts between the dealer and the buyer. The lender and dealer agree to the terms of the conditional sale contract before it is presented to the buyer, and the dealer immediately assigns it to the lender under a prearranged agreement and receives the dealer reserve. This arrangement, the Kunerts assert, is a sham; it is not a true conditional sale agreement and assignment, but a dealer-assisted loan with an illegal commission for referring the loan. We disagree, as that conclusion is contrary to both legal precedent and a sensible construction of the statutory scheme. We discuss these two points in turn.

> a. *Legal precedent demonstrates that the conditional sale contracts at issue are bona fide credit sales, not loans.*

In *Boerner v. Colwell Co., supra,* 21 Cal.3d 37, the Supreme Court held that a financial institution's "central position" in shaping a credit sale transaction between the seller and buyer "from the outset" did not operate to convert the resulting transactions, including a contemplated assignment to the financing institution, into a loan subject to the usury laws. (*Id.* at pp. 50, 52–53.) *Boerner,* in our view, is dispositive, and compels the conclusion that the financing transactions at issue are exactly what they purport to be: bona fide conditional sale contracts followed by assignments.

*Boerner v. Colwell Co.* involved installment contracts for the construction of vacation homes, in which the builder arranged financing for the purchaser with Colwell, a mortgage banking firm. The builder and the purchaser were

---

[9] The Kunerts' reasons for asserting only a violation of subdivision (b) are not clear. Mission Financial suggests the Kunerts did so because the trial court in a San Diego case recently rejected similar claims under subdivision (d), after a full trial. Counsel in this case clearly stated the Kunerts' reliance on subdivision (b), but in earlier proceedings in the case stated that "[i]t may be in the end it's a (d) case, as well."

the parties to the installment contracts, which were then purchased by Colwell. Colwell and the builder agreed in advance upon the conditions on which Colwell would accept the builder's contracts for purchase. Colwell provided the builder with the necessary forms, including a credit application and a lien contract/deed of trust, and advised the builder of the finance charge to be used to render the contract acceptable for assignment. (*Boerner v. Colwell Co., supra*, 21 Cal.3d at p. 41.) The forms were filled out and executed by the purchaser and builder and submitted to Colwell, which performed a credit check and other investigations. If the results were acceptable, Colwell would inform the builder and purchaser of its acceptance of the contract and would record the assigned contract and deed of trust. At that point, the purchaser became bound to pay Colwell the deferred purchase price in monthly installments as reflected in the assigned lien contract. (*Id.* at p. 42.)

The purchasers brought suit alleging the contracts were usurious loans. The trial court concluded the transactions "were bona fide credit sales and 'not parts of loan transactions clothed in the form of credit sales'—and that the respective assignments of the builder's rights to Colwell were 'an assignment of rights under a credit sale and were not loans by [Colwell] in the form of assignments.' " (*Boerner v. Colwell, supra*, 21 Cal.3d at p. 43.) The Supreme Court affirmed, answering "clearly no" to the question whether "the mere participation by a ... financing institution ... operate[s] to convert what would otherwise be regarded as a bona fide credit sale ... into a 'loan' " subject to the usury laws. (*Id.* at p. 52.)

The Kunerts argue, however, that the question whether the transactions alleged in the complaint are bona fide conditional sale contracts followed by valid assignments, or dealer-assisted loans, is a question of fact which cannot be resolved on demurrer. In *Boerner*, they point out, the trial court resolved the bona fides of the transactions after a bench trial, and the Supreme Court merely found that the evidence supported the trial court's determination that the parties' dealings were in good faith. (*Boerner v. Colwell Co., supra*, 21 Cal.3d at p. 52.) While that was indeed the procedural posture of *Boerner*, it fails to assist the Kunerts in this case.

*Boerner* involved a claim that the transactions were usurious loans rather than bona fide credit sales. ■ The "question of fact" was whether the transaction was designed to evade the usury law, or to finance a bona fide sale of property: "In all such cases [involving whether an arrangement is usurious] the issue is whether or not the bargain of the parties, assessed in light of all the circumstances and with a view to substance rather than form, has as its true object the hire of money at an excessive rate of interest. [Citation.] The existence of the requisite intent is always a question of fact." (*Boerner v.*

*Colwell Co., supra,* 21 Cal.3d at p. 44; see also *Glaire v. La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 927 [117 Cal.Rptr. 541, 528 P.2d 357] ["the good faith of the parties is crucial to the insulation of discount transactions from usury consideration, and good faith is ultimately a question of fact"].) Thus, the "fact" or "intent" issue in *Boerner,* and in other cases alleging transactions are usurious loans rather than bona fide credit sales, is whether the "substantial intent of the parties was to effect the hire of money at an excessive rate of interest rather than to finance a bona fide sale of property." (See *Boerner v. Colwell Co., supra,* 21 Cal.3d at p. 54.) When parties intend to finance a bona fide sale of property, real or personal, the transaction is a credit sale, not a loan. (See *Verbeck v. Clymer* (1927) 202 Cal. 557, 562–563 [261 P. 1017] [a credit sale will not constitute usury however great the difference between the cash and credit prices, "… unless the buying and selling was a mere pretense"].)

This case, however, does not involve any question of usurious intent, or indeed any other question of fact. There is only the legal question whether the transactions are dealer-assisted loans or valid conditional sale contracts and assignments. The facts are not contested. It is undisputed that the lenders pay the dealers a commission; indeed, such payments have been an integral part of the indirect auto finance market since at least the 1960's. It is likewise undisputed that the existence of the commission is not disclosed to the purchaser in the conditional sale contract. This nondisclosure is of no significance, as disclosure of the commission is not required under either the federal Truth in Lending Act (15 U.S.C. § 1601 et seq.) or the Rees-Levering Act; the Kunerts do not contend otherwise.[10]

In sum, there is no question of good faith or intent, because usury is not an issue and disclosure is not an issue. Moreover, the Kunerts do not point to any other fact issue to be decided. There is no allegation, nor could there be, that the buyer and seller intend anything other than "to finance a bona fide sale of property"—the automobile. (*Boerner v. Colwell Co., supra,* 21 Cal.3d

---

[10] In 1977, the Federal Reserve Board issued a decision interpreting Regulation Z (12 C.F.R. § 226 (2003)), which implemented the federal Truth in Lending Act. The board ruled that a dealer participation need not be identified or disclosed in Truth in Lending disclosures as a separate component of the finance charge. At the same time, the board withdrew a proposal that would have required separate disclosure of the existence, but not the amount, of a dealer participation. The board concluded that disclosure of the total finance charge and widespread advertisement of credit terms afforded consumers "the most important information with which to comparison shop for credit." Also, the board believed the addition of another disclosure requirement would result in more complex disclosure statements and could lead to confusion or misunderstanding by consumers. (42 Fed. Reg. 19124–19125 (Apr. 12, 1977).) ██ The Rees-Levering Act requires every conditional sale contract to contain the disclosures required by Regulation Z. (Civ. Code, § 2982.) Rees-Levering also specifies that any disclosure required under Rees-Levering may be disclosed "in any manner, method, or terminology required or permitted under Regulation Z." (*Id.,* § 2982, subd. (m).)

at p. 54.) ■ That brings us full circle to *Boerner*, which teaches that the lender's participation in shaping the credit transaction between the buyer and seller does not transform a credit sale into a loan.

The Kunerts insist we must look to the substance, not the form, of a particular financing arrangement. ■ They say it is "intended from the beginning" that the purchase will be financed by the lender, and there is no difference to the consumer between a dealer-assisted loan and a conditional sale contract followed by an assignment.[11] The point is of no moment; in *Boerner*, too, it was "intended from the beginning" that the purchase would be financed by the mortgage company, not the builder. That intention did not detract from the conclusion the transaction was a bona fide credit sale, not a loan.

> b. *The consumer protection policies the statute was designed to promote would be reduced, rather than enhanced, if the transactions at issue were construed as dealer-assisted loans.*

Finally, the Kunerts suggest that rejection of their challenge to the legality of the dealer reserve would frustrate the policy embodied in Rees-Levering of protecting consumers "against the evils which occur when dealers and lenders jointly control the long term financing process." For this proposition they cite *Hernandez v. Atlantic Finance Co., supra*, 105 Cal.App.3d 65, 75, in which the court expressly stated that Rees-Levering was designed to protect "the unwary nave purchaser who is the victim of financing arrangements controlled jointly by the seller and lender."

This contention also misses the mark. ■ First, the evils Rees-Levering was designed to remedy, as comprehensively described in *Hernandez*, did not include the payment of commissions to dealers. Second, and more importantly, construing the transactions at issue as dealer-assisted loans rather than conditional sale contracts would reduce, not enhance, the protections provided by Rees-Levering.

As *Hernandez* explained, Rees-Levering was directed at protecting the unwary, unsophisticated consumer against such evils as excessive interest

---

[11] The Kunerts cite a case from the state of Washington opining that where a purchase is financed from the beginning, there is never a true conditional sale. (*National Bank of Commerce v. Thomsen* (1972) 80 Wn.2d 406, 414 [495 P.2d 332].) While that may be the law in Washington, it is plainly not the law in California. (*Boerner v. Colwell Co., supra*, 21 Cal.3d at pp. 45, 52.) Moreover, contrary to the Kunerts' assertion, there is a difference to the consumer between a dealer-assisted loan and a conditional sale contract followed by an assignment; if the transaction is a dealer-assisted loan, the lender may obtain security in addition to the vehicle, and numerous other provisions of Rees-Levering will not apply. (See part A.2.b., *post*.)

charges; lack of full disclosures to the buyer; taking of security in addition to the car to assure repayment; the use of more than one document in connection with the sale and financing; and lack of protection in the event of default and repossession. (*Hernandez v. Atlantic Finance Co., supra,* 105 Cal.App.3d at p. 75.) These were harms that could occur in third party loans not protected by Rees-Levering. Consonant with the legislative purpose of eliminating those evils, *Hernandez* held that the statutory exclusion of third party loans from the requirements of Rees-Levering applied only to independently negotiated third party loans, not to dealer-assisted third party loans. (105 Cal.App.3d at p. 77.) Otherwise, the protections Rees-Levering was designed to provide would be eviscerated by the use of unregulated, dealer-assisted loans rather than regulated conditional sale contracts. Thus, under the *Hernandez* decision, dealer-assisted loans were subjected to all the provisions of the Rees-Levering Act; only personal loans in which the dealer was not involved were excluded from Rees-Levering requirements.

■ In reaction to the *Hernandez* decision, the Legislature amended Rees-Levering, so that dealer-assisted personal loans are not subject to the full panoply of the provisions of the Rees-Levering Act. Instead, Civil Code section 2982.5, subdivision (d) specifically enumerates the conditions under which dealers may assist buyers in obtaining loans from third parties. Subdivision (d) applies certain critical provisions of Rees-Levering to third party loans, including provisions governing repossession, default, reinstatement and the like (Civ. Code §§ 2983.2, 2983.3 and 2984.4). (See fn. 5, *ante* and accompanying text.) However, the loans are otherwise not subject to Rees-Levering requirements. For example, loans may be secured by liens on the buyer's personal property in addition to the vehicle purchased (§ 2982.5, subds. (b) & (d)(1)), while liens on other property are strictly prohibited in conditional sale contracts. (§ 2984.2.)

Thus, there is a critical flaw, from a consumer protection perspective, in the Kunerts' claim that the transactions are really dealer-assisted loans and not conditional sale contracts. If they are loans governed by Civil Code section 2982.5, rather than conditional sale contracts governed by all the provisions of the Rees-Levering Act, the very protections Rees-Levering was designed to provide would be reduced, rather than enhanced. By contrast, construing the transactions as bona fide conditional sale contracts and assignments, as we are compelled to do under *Boerner v. Colwell Co., supra,* 21 Cal.3d 37, provides consumers with the full range of protection Rees-Levering was designed to provide. Accordingly, considerations of policy, as well as clear legal precedent, militate against the Kunerts' claim that these transactions are dealer-assisted loans rather than conditional sale contracts.

In sum, payment of the dealer reserve in the transactions described in the complaints does not violate the Rees-Levering Act. As the trial court concluded, the provision purportedly violated applies only to side loans, not to the full loans described in the complaint. Moreover, even if that provision applied, or if the Kunerts alleged a violation of subdivision (d) prohibiting commissions on full loans, the claim fails. The transactions in question are not loans; California law is clear that lender participation in a credit transaction between buyer and seller does not convert the transaction into a loan. This conclusion fully comports with the consumer protection objectives of the Rees-Levering Act.

> B. *Payments of the dealer reserve are not secret payments that violate the Unfair Practices Act, Business and Professions Code section 17045.*

The Unfair Practices Act, codified at Business and Professions Code section 17000 et seq., was enacted to safeguard the public against monopolies and to encourage competition "by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (Bus. & Prof. Code, § 17001.) The Kunerts allege that the commission paid by Mission Financial to the dealer when Mission Financial purchases a conditional sale contract from the dealer violates section 17045. That section states: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful." (Bus. & Prof. Code, § 17045.)

The trial court concluded Business and Professions Code section 17045 does not apply, because it requires a secret monetary transaction or incentive that is not extended to all purchasers. In this case, there are no secret payments to purchasers, but rather the reverse. The purportedly secret payments flow from the purchasers (the lenders who buy the conditional sale contracts) to the sellers of those contracts (the dealers). We agree with the trial court's reading of the statute.

First, the structure of Business and Professions Code section 17045 leaves virtually no room for the argument that it forbids the secret payment of commissions to sellers. The term "commissions" appears along with three (and between two) other terms that by definition may be applied only to

purchasers: thus "rebates, refunds, ... or unearned discounts" are all necessarily payments to purchasers. No reason suggests itself for including among these terms one that is intended to apply to sellers. Moreover, the ensuing clause in its entirety likewise explicitly applies to purchasers only. Accordingly, the language of section 17045 on its face suggests exactly what the trial court held: it forbids secret payments or incentives not extended to all purchasers, and has nothing to do with payments to sellers.

The Kunerts insist the statute must be read in the disjunctive. While the second clause forbids secretly extending special privileges to some purchasers and not others, the first clause forbidding secret rebates and commissions, they contend, is not expressly confined to purchasers. The Kunerts do not cite any authority supporting this proposition, or any case in which the section has been applied to a secret payment to sellers, arguing only that the statute is to be construed broadly.[12] While the statute must be construed broadly, that construction must be consonant with the legislative objective. The Supreme Court's discussion of Business and Professions Code section 17045 in *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247 [61 Cal.Rptr.2d 112, 931 P.2d 290] (*ABC Internat. Traders*) compels the conclusion the statute is addressed to secret payments by sellers to purchasers, not the reverse.

In *ABC Internat. Traders*, the Court reviewed Business and Professions Code section 17045 and its legislative history at length. While the holding was not unanimous,[13] the opinions uniformly agreed on the purpose of section 17045: to prevent a manufacturer or other supplier from discriminating among its customers. The majority stated: "Section 17045 is ... tailored to address the problem of a manufacturer or other producer who is forced or induced to give preferential prices to one or more individual purchasers, typically retailers." (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp., supra*, 14 Cal.4th at p. 1267.) According to the concurring opinion, section 17045 "implicitly defines 'unfair competition' as secret discrimination by a seller between or among its buyers." (14 Cal.4th at p. 1271 (Conc. opn. of Mosk, J.).) And the dissent observed that section 17045 refers "to those who

---

[12] The Kunerts cite *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256 [195 Cal.Rptr. 211], holding that the buyer may be liable for receiving a secret rebate, just as the seller is liable for paying it, if the practice tends to destroy competition. (*Id.* at p. 271.) As in other cases, however, the act prohibited, whether payment or receipt, is a flow of money or other favors from the seller to the buyer.

[13] Section 17045 prohibits a seller from secretly allowing unearned discounts to a purchaser that injure a competitor and tend to destroy competition. The Supreme Court held that the "competition" referred to is not limited to competition among sellers of the particular good or service, but includes economic competition among buyers as well. (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp., supra*, 14 Cal.4th at p. 1252.)

make the payments, allow the rebates, or extend the privileges made unlawful; in a word, sellers." (14 Cal.4th at p. 1275 (dis. opn. of Brown, J.).)[14]

 The views expressed in *ABC Internat. Traders* make it clear that Business and Professionals Code section 17045 addresses secret payments from a seller to a purchaser. Moreover, even if secret payments from purchaser to seller were covered, we would find it difficult to characterize payment of the dealer reserve in this case as "secret" within the meaning of section 17045. The Kunerts do not and cannot argue that the payments are secret from the competitors of the lenders who pay them, or from the competitors of the dealers who receive them. They argue only that consumers are unaware the commission is being paid. The objective of the Unfair Practices Act, however, is to prohibit practices that destroy or prevent fair and honest competition. (Bus. & Prof. Code, § 17001.) The consumer's knowledge of the commission payment has no effect on competition; it is secrecy from the purchaser's competitors, not from the consumer, that would injure competition and that Business and Professions Code section 17045 was intended to prevent.

Accordingly, the Kunerts' allegations do not state a claim for violation of Business and Professions Code section 17045.

C. *The practice of paying the dealer reserve is not an unlawful, unfair or fraudulent business practice under Business and Professions Code section 17200.*

The Kunerts contend that payment of the dealer reserve violates the unfair competition law, Business and Professions Code sections 17200 et seq. The unfair competition law is independent of the Unfair Practices Act and other laws, and its remedies are cumulative. Section 17200 borrows violations from other laws and treats them as independently actionable. In addition, practices may be deemed unfair or deceptive, even if not proscribed by some other law. Thus, there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20

---

[14] Other observations in the majority opinion included these:

—Business and Professions Code section 17045 "prohibits a seller from secretly allowing a purchaser special 'unearned discounts' that injure 'a competitor' and tend to destroy 'competition.' " (*ABC Internat. Traders, supra,* 14 Cal.4th at p. 1252.)

—"More specifically, the provision that became section 17045 was almost certainly designed to prohibit and protect against the practice of granting to chains and other large distributors, as a result of their much greater bargaining power, secret rebates, unearned discounts and other unearned allowances not granted to smaller, independent merchants." (*ABC Internat. Traders, supra,* 14 Cal.4th at p. 1261.)

—Business and Professions Code section 17045 "is patently concerned with 'preventing a distributor from discriminating between customers.' " (*ABC Internat. Traders, supra,* 14 Cal.4th at p. 1267, quoting *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 323 [70 Cal.Rptr. 849, 444 P.2d 481].)

Cal.4th 163, 179–180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) The Kunerts allege payment of the dealer reserve violates each of the three prongs of the unfair competition law. We address each of the allegations in turn.

### 1. *Payment of the dealer reserve is not an unlawful business practice.*

We have disposed of the claims the dealer reserve is unlawful based on the Rees-Levering Act and the Unfair Practices Act in parts A. and B. *ante*. On appeal, the Kunerts also contend their complaint could be amended to state a claim for vertical price-fixing, which is per se unlawful under the Cartwright Act. (Bus. & Prof. Code, §§ 16720, 16726; *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 369 [113 Cal.Rptr.2d 175].) The Cartwright Act claim would then form the predicate for the Kunerts' assertion that payment of the dealer reserve is unlawful. We conclude the complaint could not be amended to state a claim for vertical price-fixing.

The Kunerts bear the burden of demonstrating that the complaint could be amended to state a valid cause of action for vertical price-fixing. (*Chavez v. Whirlpool Corp., supra*, 93 Cal.App.4th at p. 369.) The allegations they propose are as follows:

—Within the last four years, Mission Financial "combined, conspired or agreed with automobile dealers throughout the state of California, to fix the price of [Mission Financial's] financing rates at prearranged rates that are higher than [Mission Financial's] customary rates on consumer financing."

—The purpose of the conspiracy was "to artificially maintain prices at levels higher than they would be if [Mission Financial] were compelled to compete on the competitive market with other lenders providing the same types of loans."

—"By conspiring with dealers to allow [the dealers] to increase the price of [Mission Financial's] loans and then secretly paying the dealer a commission based on the interest rate differential; i.e., the dealer reserve, the dealers channel these loans to [Mission Financial] rather than other lenders who offer lower finance rates but do not pay dealer reserves."

—"[A]s a result of the agreement involving the payment of dealer reserves, consumers are paying higher rates of interest than they would in a truly competitive market environment."[15]

---

[15] A cause of action for a conspiracy in restraint of trade in violation of the Cartwright Act "must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. ...General allegations of agreement have been held sufficient ... providing the unlawful acts or civil

These allegations do not state a valid claim that Mission Financial has engaged in a vertical price-fixing agreement with automobile dealers. A cursory analysis of antitrust principles clearly illustrates that Mission Financial's agreement to pay the dealer reserve bears no resemblance to a vertical price-fixing agreement.

A vertical price-fixing agreement, commonly known as resale price maintenance, involves the efforts of a supplier to control the distribution of its product or service by retailers or distributors. (Sher, Antitrust Adviser (4th ed. 1995) § 2.01, p. 2-3.) Such an agreement limits the distributor's freedom to sell the supplier's product at a price independently selected by the distributor (*id.*, § 2.02, pp. 2-5 to 2-6); instead, the supplier establishes the price at which its distributors may sell the supplier's products, resulting in maintenance of the resale price at a single level. The supplier's price restrictions are often enforced through the supplier's refusal to deal with a particular distributor. (*Id.*, § 2.02, p. 2-7.) A vertical price-fixing or resale price maintenance agreement between supplier and distributor "destroys horizontal competition as effectively as would a horizontal agreement among distributors or retailers" (*Chavez v. Whirlpool Corp., supra,* 93 Cal.App.4th at p. 370) and is per se unlawful under the Cartwright Act. (*Id.* at p. 369.)[16]

The Kunerts liken Mission Financial to the supplier and the dealers to the distributors of Mission Financial's product, automobile financing. They assert Mission Financial and dealers throughout California have agreed to fix the price of Mission Financial's financing rates at rates higher than Mission Financial's customary rates. First, this assertion assumes that the supplier's price and the distributor's price for the supplier's product should be the same, an assumption which is plainly wrong; retail prices are always higher than wholesale prices. Moreover, the assertion omits critical elements essential to a resale price maintenance agreement. The essence of resale price maintenance is the supplier's—in this case, Mission Financial's—control of the resale price of its automobile financing, setting it at the same level for all its dealers and thus restricting competition among the dealers on the financing rate. The Kunerts have not and cannot in good faith assert that Mission Financial set

---

wrongs are otherwise sufficiently alleged." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47 [77 Cal.Rptr.2d 709, 960 P.2d 513], quoting *Chicago Title Ins. Co. v. Great Western Financial Corp., supra,* 69 Cal.2d at p. 316.)

[16] "Resale price maintenance limits *intra*brand price competition (i.e., competition among various distributors of the supplier's brand). It also restricts *inter*brand price competition (i.e., competition among distributors of different brands of the same generic product), because the distributors of a supplier's products are not free to adjust their prices to compete with other brands." (Sher, Antitrust Adviser, *supra,* § 2.02, p. 2-6.)

the financing rate dealers must charge their customers, or made any effort whatsoever to restrict the financing rate charged by the dealer.

▮ In sum, the agreement of which the Kunerts complain is not resale price maintenance. It is merely Mission Financial's agreement to buy the dealer's contracts at the "buy rate" set by Mission Financial, and to pay the dealer the difference between that rate and the "sell rate" the dealer charges the buyer. The Kunerts do not allege that Mission Financial controls or restricts the sell rate, or requires all its dealers to charge the same sell rate.[17] They have not alleged that Mission Financial would refuse to do business with the dealer if the dealer charged a different and lower sell rate. They have not alleged any limitation on competition among dealers on the sell rate they charge to buyers. Without such allegations, the Kunerts cannot state a claim for vertical price-fixing; no resale price maintenance exists. Accordingly, the Kunerts have no basis for claiming payment of the dealer reserve is an unlawful business practice.

### 2. *Payment of the dealer reserve is not a fraudulent business practice.*

The term "fraudulent" as used in Business and Professions Code section 17200 requires only a showing that members of the public are likely to be deceived. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].) The Kunerts contend "the practice of paying dealer reserves as alleged in the complaint is likely to deceive members of the public into believing that the rate of interest quoted by the dealer is the rate of interest being charged by the lender."

The Kunerts effectively assert that payment of the dealer reserve is deceptive merely because it is not disclosed to consumers. ▮ However, disclosure is not required by law, and indeed the Federal Reserve Board long ago rejected the proposition that such disclosure would be useful to consumers. (See fn. 10, *ante*.) Moreover, the Kunerts allege no facts suggesting why a reasonable person would believe that the financing rate in his or her contract with the dealer is the same rate at which a lender would make a direct loan. Indeed, a reasonable person would likely believe the opposite; the Federal Reserve Board thought so, and several courts have agreed. (See, e.g.,

---

[17] The trial court in a case involving similar claims in San Diego (see fn. 9, *ante*) observed: "Market forces, competition, and the dealer's own long-term interest in maintaining a customer base, impose important constraints on the contract [sell] rate and amount of dealer participation. If the dealer quotes too high a contract price or interest rate, the car buyer is likely to find a better deal from another car dealer and/or seek financing from direct lenders willing to make a direct loan at a lower interest rate .... The dealer's own long-term interest in keeping its customers satisfied ... curbs the dealer's desire for a quick profit through a higher contract rate and dealer participation payment."

42 Fed. Reg. 19124–19125 (Apr. 12, 1977) ["although rates available on direct loans are often somewhat lower than in dealer-arranged loans, the Board believes that consumers are generally aware of this fact"]; *Balderos v. City Chevrolet* (7th Cir. 2000) 214 F.3d 849, 853 ["an automobile dealer is not its customers' agent .... [The buyer] knows, or at least has no reason to doubt, that the dealer seeks a profit on the financing as well as on the underlying sale"].) Accordingly, we conclude payment of the dealer reserve as alleged in the complaints does not constitute a fraudulent business practice.

### 3. *Payment of the dealer reserve is not an unfair business practice.*

The Supreme Court has not yet enunciated a legal test for unfairness in consumer actions under the unfair competition law. The Courts of Appeal have variously suggested that a practice is unfair if it offends an established public policy or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, " and that unfairness is determined by weighing the utility of the practice against the gravity of the harm to the consumer. (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1170 [121 Cal.Rptr.2d 79].) The Kunerts contend payment of the dealer reserve offends the Legislature's "established public policy" of consumer protection embodied in Rees-Levering, and that consumers pay higher interest rates "to accommodate the payment of commissions" to dealers. The gravity of the harm to consumers, they contend, must be balanced against the justifications for the practice, and the balancing cannot be accomplished on demurrer. We disagree.

We have already rejected the notion that payment of the dealer reserve is contrary to the consumer protection policies embodied in Rees-Levering. (See pt. A.2.b., *ante.*) The claim that consumers pay higher interest rates than they would if no dealer commission existed may be true, but that is scarcely unfair. Dealers, like any other retailer, seek a profit on the credit services they provide. ■ We are compelled to agree with Mission Financial that the "unfair" prong of the unfair competition law was not intended to eliminate retailers' profits by requiring them to sell at their cost, whether the product is automobiles or automobile financing. In short, we discern no offense to public policy, and no unfairness to be weighed. Payment of the dealer reserve is not an unfair practice under the unfair competition law.

## DISPOSITION

The judgments are affirmed. Mission Financial Services Corporation, The Money Store Auto Finance, Inc. and Consumer Portfolio Services are to recover their costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

The petition of all appellants for review by the Supreme Court was denied October 29, 2003. Kennard, J., was of the opinion that the petition should be granted.