Filed 12/30/14  Marriage of Zinn and Gurne CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of WENDY J. ZINN and G. RONALD GURNE. | B251654 (Los Angeles County Super. Ct. No. BD433184) |
| WENDY J. ZINN, Respondent, v. G. RONALD GURNE, Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ralph C. Hofer, Judge.  Affirmed.

Needham Law Firm, Carlos E. Needham, for Appellant.

No appearance for Petitioner and Respondent.

Wendy J. Zinn filed a petition to dissolve her marriage to G. Ronald Gurne on September 16, 2005. The ensuing protracted divorce proceedings culminated in a seven-day trial in May 2013, at which both Zinn and Gurne appeared in propia persona. The trial court issued a lengthy combined judgment and statement of decision on July 30, 2013. With the aid of counsel, Gurne timely appealed. He contends that the trial court erred by (1) awarding *Watts* charges for a period of time in which he did not have exclusive possession of the family home; (2) failing to account for two post-separation loans he contends he made to Zinn; (3) placing upon him the burden of proof as to his breach of fiduciary duty claims; (4) exercising jurisdiction over certain commercial property; and (5) misinterpreting a letter relating to the commercial property. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As the abbreviated factual summary in Gurne's brief suggests, little of the labyrinthine history of this case is relevant to the instant appeal. We accordingly relate only the background information necessary to resolve the issues properly presented at this juncture. Because Gurne does not challenge most of the trial court's factual findings, and provides us only with a skeletal "factual summary," we rely predominantly on the trial court's combined judgment and statement of decision for much of the summary provided below.

### I.    *The Home & Related Reimbursements*

Gurne and Zinn married on August 18, 1979, and purchased a home in Valencia in the late 1980's. They separated on August 19, 2004. Zinn began a long-term romantic relationship with a woman who lived in Riverside on August 20, 2004. From then until the tragic death of Zinn and Gurne's youngest son on February 3, 2006, Zinn divided her time between her girlfriend's home in Riverside and the family home in Valencia. She testified at trial that she spent weekends and "most of the time" in Riverside but came by the Valencia house "to help with the kids and things like that." On "real late night[s]," approximately two or three times a week, she slept on the couch at the Valencia home. In

2

2005, Zinn changed her mailing address from the Valencia home to her Santa Clarita office and spent "less time with the children in Santa Clarita and more time in Riverside County." Zinn completely ceased spending time at the family home after her son's death in February 2006. Gurne continued to reside there, however. The couple's surviving teenaged son remained in the home with Gurne for a time as well.

There is no dispute that Gurne made all of the mortgage and insurance payments on the family home from September 1, 2004, all the way through trial. The court found that Gurne "exercised sole possession and control" of the home as of September 1, 2004, and accordingly assessed a *Watts* charge of $107,850.00 and awarded an *Epstein* credit of $157,147.00, both for the period of September 1, 2004, to June 2013. (*In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84-85 (*Epstein*), superseded by statute on other grounds; *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 374 (*Watts*).)

Gurne claimed that he spent $85,000 renovating the home between 2006 and 2008. Gurne submitted photographic evidence documenting the extensive renovations, and Zinn conceded they were completed, but Gurne was unable to precisely trace the source of the funds he used. The court, purportedly applying the "more recent relaxed tracing requirements of *In re Marriage of Ficke*" (2013) 217 Cal.App.4th 10, nonetheless ruled that he was entitled to reimbursement for the full $85,000 claimed, less $48,500 that the court found Zinn loaned him post-separation. The court did not consider whether or to what extent Gurne might be entitled to reimbursement for separate funds and labor he allegedly contributed to the Walnut Street properties discussed more fully below.

## II. *Breach of Fiduciary Duty*

Zinn is an accountant. During the couple's marriage, she operated a small accounting firm, Zinn & Associates, Inc., and also performed accounting and financial services work for two small businesses operated by Gurne, RKT Real Estate Services, Inc., and GZ Associates, Inc. The trial court found, and Gurne does not dispute, that these three businesses—all of which are now defunct— properly were characterized as community property.

3

Gurne alleged that Zinn breached her fiduciary duties prior to the parties' separation by using money from "his" businesses both for personal gain and to prop up "her" business, Zinn & Associates. The court placed upon him the burden of proving "that there has been misappropriation of community property assets for the exclusive separate property use or conversion by Ms. Zinn such that substantial impairment has been proven" under Family Code, section 1101, subdivision (a).[1] Gurne states in his brief that he "adduced extensive evidence showing various categories of missing funds that were under Ms. Zinn's control," but provides no information about this evidence other than a single citation to a 79-page span of the five-volume reporter's transcript. Our review of this lengthy excerpt suggests that the trial court accurately described the evidence (which is not itself in the appellate record) as excerpts from the businesses' QuickBooks bookkeeping files and business tax returns, "all covering the time period 1994 to 2009, with accounting analysis," with a nearly singular focus on Zinn's alleged misconduct during the marriage.

During Gurne's presentation at trial, in the context of explaining the concepts of waste and misappropriation, the court commented, "right now the money is sort of falling into a hole and no one knows what happened to the money." The court ultimately concluded that Gurne's voluminous evidence "may demonstrate that the Petitioner (Zinn) is a spend thrift [*sic*] and mismanages money, [but] it does not demonstrate that the Petitioner committed waste of community property assets or misappropriated community property assets."

### III. *The Walnut Street Properties*

In fall 2005, Gurne served as the real estate broker in transactions involving two properties on Walnut Street in Newhall, "Walnut 1" and "Walnut 2." The Walnut 1 transaction closed on or about November 1, 2005—approximately 15 months after the date of separation and about 1.5 months after Zinn filed her petition for dissolution. The

---

[1]     All further statutory references are to the Family Code unless otherwise indicated.

4

$950,000 purchase money for Walnut 1 consisted of a $120,000 cash contribution from Sue Arellano, with whom Gurne alleges he, Zinn, and Jason Stoddard had formed a business venture or partnership; an additional $30,000 from Arellano that was funneled through RKT Real Estate; a $665,000 purchase money mortgage in Arellano's name; and a $150,000 direct-to-escrow contribution from Zinn's mother's trust fund, the Joan Gillis Zinn Trust. Arellano took title to Walnut 1 in her name and still holds title to the property. Gurne testified at trial that "Wendy and I are not anywhere on ownership on this property at all." Additionally, he and Zinn both testified, and the court found, that no payments toward Walnut 1 (or Walnut 2) were made from any accounts held jointly by the marital community.

The Walnut 2 transaction also closed on or about November 1, 2005. Title to Walnut 2 was held in the name of the alleged Gurne-Zinn-Arellano-Stoddard venture, Tellus, LLC. Tellus, LLC took out a $210,000 loan secured by the Walnut 2 property. The remainder of the purchase was financed by a $250,000 direct-to-escrow contribution from the Joan Gillis Zinn Trust, a $52,663 deposit by Stoddard, and a $12,000 deposit from Arellano's Moon Stone Consulting Company. Walnut 2 was sold at a loss in 2010.

Gurne contended in his trial brief and at trial that the marital community had an interest in Walnut 1 and Walnut 2 by virtue of the contributions from the Joan Gillis Zinn Trust, which he described as a "loan [ ] made to us to acquire the property." He introduced into evidence a letter from Joan Zinn dated September 24, 2008, documenting the loan. The letter stated:

"In response to your inquiry, yes, the funds wired to the two escrow companies at Wendy's instructions represented a loan to Wendy Zinn from the Joan Zinn Trust . . . . These funds were not Wendy's separate funds. The money was loaned to your family. I have received a hand written document from Wendy indicating she acknowledges these funds are a loan and not a gift. However, I, and my attorney, Rob Butterfield, have requested on multiple occasions a formal promissory note, collateralized by the buildings, be signed by Wendy and notarized, but she has yet to provide this documentation. . . . [¶]

5

It is my understanding from Wendy that the $150,000.00 was being used to purchase the property at 24303 Walnut Street and the $250,000.00 was used to purchase the property at 24363 Walnut Street, both in Santa Clarita, CA 91321. [¶] Hopefully this clarifies that these funds were loaned to Wendy from the trust, not provided as a gift."

The trial court found during trial that "the overarching impact of that letter shows that she [Joan] was expecting to get a promissory note from her daughter for the loan. She never got a promissory note from the daughter. There is no indication in that letter that she is also seeking a promissory note from [Gurne] or seeking to get repayment from [Gurne]." The trial court reaffirmed its oral ruling in its combined judgment and statement of decision, stating, "in a letter from Petitioner's mother dated September 24, 2008, the mother, Ms. Joan Zinn, loaned $150,000 of her funds to Petitioner for the purchase of the Walnut 1 property with the expectation that Petitioner would execute a promissory note for the amount with only the Petitioner being named as the obligor, not both Petitioner and Respondent. Hence, it is clear that the Zinn Trust loan was not a gift, and the lender, the Zinn Trust, was not looking to the community estate, [even] assuming [Gurne's proposed] date of separation of February 6, 2006, for repayment." In other words, the court found (1) the contributions were a loan and (2) the loan was made to Zinn exclusively.

The court ultimately characterized both Walnut Street properties as Zinn's separate properties, "to the extent of her ownership interests as established by the legal entities which own the properties," "based on the date of separation." The court further concluded that, "even if the Walnut 1 and Walnut 2 properties were acquired using Respondent's date of separation of February 6, 2006, it is clear from the real estate purchase documents, including the escrow closing statements for each property, that the source of the funds did not originate from the earnings or assets of either party such that the presumption of [Family Code, section] 760 that any property acquired during marriage is community property is rebutted." That is, "no community funds were used to purchase these two properties." In light of this ruling, the court concluded that "[a]ny

6

claims for reimbursement regarding the two Walnut Street properties are not within this Court's jurisdiction because they are separate."

The court acknowledged Gurne's contentions that he had an interest in the Walnut Street properties through the alleged partnership and his alleged contributions of labor. The court also admitted evidence of Gurne's pending lawsuit against Arellano, Zinn, and Stoddard, in which Gurne alleges that he "has an ownership interest in the [Walnut Street] properties by virtue of his membership in" Tellus, LLC, and that he "contributed both monetary capital (whether that is characterized as separate or community funds) and human capital" to Tellus, LLC. Despite Zinn's concession that Gurne "may have put money into those properties," the court did not address the merits of these allegations. It held only that the monies from the Joan Gillis Zinn Trust were Zinn's separate funds and that the stake in the Walnut Street properties attributable to these monies was Zinn's separate property, "to the extent of her ownership interests as established by the legal entities which own the properties."

## DISCUSSION

### I. *The Home & Related Reimbursements*

#### A. The *Watts* Charge

"'Where one spouse has the exclusive use of a community asset during the period between separation and trial, that spouse may be required to compensate the community for the reasonable value of that use.' [Citation.] The right to such compensation is commonly known as a '*Watts* charge.' [Citation.]" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 978.) "Where the *Watts* rule applies, the court is 'obligated either to order reimbursement to the community or to offer an explanation for not doing so.' [Citation.]" (*Ibid.*) "But 'where the asset is not owned outright by the community but is being financed,' the spouse in possession 'may satisfy the duty to compensate the community for use of the asset by making the monthly finance payments from his or her separate property.' [Citation.]" (*Id.* at pp. 978-979.) These offsets are typically called "*Epstein* credits." (*Id.* at p. 979; *Epstein*, *supra*, 24 Cal.3d at pp. 84-85.) The trial court

7

must "[t]ake into account all the circumstances relevant" to the exclusive possession by one spouse when assessing *Watts* charges and *Epstein* credits (*Watts*, *supra*, 171 Cal.App.3d at p. 374), but is vested with discretion to order reimbursement that is equitable on the facts of the case before it. (See *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1272.)

Here, the court concluded that Gurne had "exclusive possession and control" of the Valencia home from September 1, 2004 forward, and therefore was obligated to reimburse the community via a *Watts* charge the fair market rental value of the property during that duration, which the court calculated to be $107,850. Because it was undisputed that Gurne also bore full responsibility for the mortgage, tax, and insurance payments during that same period, the court awarded an *Epstein* credit in the amount of $157,147.

Gurne now contends that "any *Watts* credit attributable to the period prior to February 2006 was the product of legal error" because Zinn's part-time presence at the Valencia home during this period necessarily meant that he did not have "*exclusive* use" of the home at that time. Neither he nor the attorney who appeared on his behalf at closing argument and the hearing on entry of judgment presented this contention to the trial court.[2] "As a general rule, theories not raised in the trial court cannot be raised for the first time on appeal." (*City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 28.) This rule, which is aimed at ensuring fundamental fairness to both the trial court and opposing parties (*ibid.*), applies equally to litigants represented by counsel and those proceeding in propia persona. (See *Harding v. Collazo* (1986) 177 Cal.App.3d 1044, 1056). We accordingly reject this belatedly raised contention. Even if

---

[2]     Gurne's attorney, the same counsel who is representing him on appeal, instead argued that the *Watts* charge "was a pretty high number here" and that the court "should consider a lower number because this property is just in really, really bad shape."

8

we were to consider it, however, we would conclude that the court did not abuse its broad discretion in allocating *Watts* charges under the totality of the circumstances in this case.

Gurne points to the court's oral finding that Zinn was a "resident" of Los Angeles County as evidence that he did not have exclusive use of the home during the entirety of the parties' separation. The court made this oral finding as part of a colloquy apparently aimed at ensuring that the residency requirements set forth in section 2320, subdivision (a), were satisfied. For purposes of that statute, residency is synonymous with domicile; one must have both an active residence and an intention to remain. (*In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 156; *In re Marriage of Thornton* (1982) 135 Cal.App.3d 500, 507.) The court's oral statement that Zinn was a "resident" of Los Angeles County thus necessarily implied that she was both living at the Valencia house and intended to stay there. This conclusion is, as Gurne suggests, facially inconsistent with the court's written rulings that he had exclusive possession of the home, that "all of the objective factors" including "separate residences" are "consistent with the August 19, 2004 date of separation," and that Zinn "was living with [her girlfriend] in Riverside County starting in the Fall of 2004 and . . . stayed at the Family residence two or three times a week to help the children with school matters."

However, until a final decision is rendered, the trial court is entitled to revise any oral pronouncements of intended decision, even if they directly contradict the final order. (See Cal. Rules of Court, rule 3.1590(b); *In re Marriage of Boblitt* (2014) 223 Cal.App.4th 1004, 1029-1030.) That is, so long as an oral ruling has not been entered in the minutes as the final order, a trial court is entitled to file a written order that differs from its oral ruling. (*Id.* at p. 1029-1030; cf. *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1170.) Thus, the court was entitled to supersede its superfluous[3] oral

---

[3] A court may enter judgment dissolving a marriage when *either* party to the marriage resided in the county of filing three months prior to the filing of the petition. (§ 2320, subd. (a).) Gurne indisputably fulfilled that criterion. Moreover, the residency requirement in section 2320, subdivision (a), is not "jurisdictional" in the fundamental sense that without it the court has no power to act. (*DeYoung v. DeYoung* (1946) 27

pronouncement that Zinn was a "resident" of Los Angeles County three months prior to the filing of her petition with a written ruling to the contrary.

The court's written ruling was well supported by substantial evidence. (See *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40.) The evidence credited by the trial court in its written judgment and statement of decision demonstrated that Zinn at most maintained a tangential connection to the family home after the parties' separation "only for the sake of the children so that the Petitioner could remain in the lives of the children." The court also found credible testimony that Zinn slept on the couch and changed her mailing address, which further supports its implicit conclusion that Zinn was more akin to a guest in Gurne's home from fall 2004 through February 2006 than a cohabitant with equal rights in the property. Gurne has not indicated how Zinn's occasional presence in the family home for the singular purpose of maintaining a relationship with the children diminished his exclusive possession and control of the home he resided in continuously. Nor has Gurne explained how the court's decision to award *Watts* charges for the full time period between separation and trial is inequitable or an abuse of discretion. The court awarded Gurne more-than-offsetting *Epstein* credits and a sizeable reimbursement for renovations to the Valencia home, notwithstanding Gurne's inability "to trace any of his expenditures to his personal post separation income or to trace RKT or [separate property business] GRG construction related expenses to the improvements made to the Family Residence from 2006 to 2008." In view of these awards, we discern no inequity or abuse of discretion and accordingly affirm the *Watts* charges assessed by the trial court.

### B.    The $48,500 Loan

Gurne also contends – and this is the entirety of his argument on the point – that "[n]o reason in law or equity exists that could support the trial court's failure to take into

Cal.2d 521, 526.) Any objection that residence requirements have not been met is waived unless it is raised by a timely motion to quash the proceeding. (Cal. Rules of Court, rules 5.63(a) & (d).) No such motion was made here.

account the two loans, given that Appellee admitted she received them. That failure is just pure oversight, or it is utterly capricious and arbitrary." The nature and amount of the "loans" to which he refers were hotly contested issues during the seven-day trial. The trial court admitted evidence from Gurne that he loaned Zinn some $68,750 around December 2005 and that she still owed him almost $20,000. Zinn stipulated that Gurne "may have put money into those properties," the Walnut Street properties, "in order for those buildings to close," and conceded that Gurne made some contribution. The parties and court extensively reviewed Gurne's evidence – and lack of documentation of any personal loans made to Zinn – throughout the trial. Gurne does not note, but we do, that the court also admitted evidence from Zinn that she loaned Gurne $48,500 to make improvements to the house, including documentation of such a loan in RKT Real Estate's books, that the roughly $20,000 she purportedly owed Gurne was in fact the sum he owed her, and that the loan money Gurne claimed pertained to the Walnut Street properties. In other words, the parties presented the court with competing evidence as to the provenance and character of roughly $68,000.

The court credited Zinn's evidence and awarded her "the reimbursement of the $48,500 loan based on the loan being recorded as a long term liability on RKT's 2005 balance sheet categorized as 'Loan-Zinn' . . . and a showing that RKT was still carrying the loan as a current liability on its most recent (May 27, 2013) accounting records." The court concluded that it lacked jurisdiction to the extent that the disputed funds were contributed to the Walnut Street properties and were the subject of Gurne's separately pending suit. The court did not award Gurne any reimbursement, and that appears to be what he is challenging in his two-sentence argument.

"'"Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts but fails to support it with reasoned argument and citations to authority, we treat the point as waived.'" [Citation.] "We are not bound to develop appellants' argument for them."'" (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1509.) We therefore treat this

11

contention as waived.  In any event, we see no error in the court's ruling.  Contrary to Gurne's assertions, Zinn never "clearly admitted at trial that she received two checks (as loans) from the Appellant after separation, in the amount of roughly $48,750."  At best, Zinn conceded that Gurne made some contribution to the Walnut Street properties.  The court, as the trier of fact, considered all of the evidence concerning the "loans" and ultimately found Zinn's documentary evidence more credible than Gurne's uncorroborated testimony.  Substantial evidence supported the court's resolution of the $48,500 dispute and we see no basis for disturbing its judgment.

## II. *Breach of Fiduciary Duty*

Gurne argues that the trial court erred by assigning to him the burden of proving his breach of fiduciary duty claims.  He contends that Zinn, not he, should have been required to account for unspecified "various categories of missing funds that were under Ms. Zinn's control."  In his view, "[t]he managing spouse 'should bear the burden of proving the proper disposition of missing assets' after the other spouse has made a prima facie showing of missing assets."  (*In re Marriage of Margulis* (2011) 198 Cal.App.4th 1252, 1274 (*Margulis*).)  He contends that the court's comment about assets "falling into a hole" confirms that he made an adequate prima facie showing such that the burden of proof should have shifted to Zinn.  The allocation of the burden of proof is a legal question that we review *de novo*.  (*Fountain Valley Regional Hospital & Medical Center v. Bonta* (1999) 75 Cal.App.4th 316, 323.)

*Margulis* is the only case Gurne cites in support of his position.  This is problematic, because *Margulis* is legally and factually distinguishable and Gurne has not clarified how or why its holding should be extended to the instant case. In *Margulis*, a husband and wife separated after a 33-year marriage.  (*Margulis*, *supra*, 198 Cal.App.4th at p.1257.)  During their 12-year separation, husband had exclusive control over many of the community's assets, including several sizeable investment accounts.  (See *id*. at pp. 1257-1259.)  "Just before trial, however, husband disclosed for the first time that the once-brimming investment accounts were virtually empty."  (*Id.* at p. 1257.)  Wife, who

12

claimed that husband breached his fiduciary duty, offered into evidence a two-page document showing the assets' values three years into the separation and argued that the trial court should accept those values unless husband could prove that he properly used the assets for community purposes or that the decline was attributable to market forces. (See *id.* at p. 1262.) Although the trial court ruled in wife's favor on her breach of fiduciary duty claim, it rejected her contention regarding the burden of proof and concluded that her evidence was insufficient to demonstrate what happened to the assets. (See *id.* at p. 1265.) The trial court awarded wife only $20,000 in sanctions for the breach and $30,000 in attorney fees. (*Ibid.*)

The court of appeal reversed. Noting that the trial court's "failure to place the burden of proof on [husband] relieved him of the duty to account for his postseparation management of these assets," gave rise to a "risk of abuse," and "runs afoul of the statutory scheme imposing broad fiduciary duties of disclosure and accounting on a managing spouse," the court adopted the rule that "once a nonmanaging spouse makes a prima facie showing concerning the existence and value of community assets in the control of the other spouse *postseparation*, the burden of proof shifts to the managing spouse to rebut the showing or prove the proper disposition or lesser value of these assets." (*Margulis*, *supra*, 198 Cal.App.4th at pp. 1266-1267 [emphasis added].)

Although the *Margulis* court's thoughtful analysis included a discussion of broad legal principles (see *id.* at pp. 1267-1272), it consistently cabined its conclusion and holding to the postseparation context. (See *id.* at p. 1258 ["Once a nonmanaging spouse makes a prima facie showing of the existence and value of community assets in the other spouse's control postseparation, the burden of proof shifts . . ."]; *id.* at p. 1266 ["We agree the trial court erred . . . in refusing to shift the burden of proof to [husband] to show the disposition and valuation of community assets in his control postseparation."]; *id.* at 1267 ["once a nonmanaging spouse makes a prima facie showing concerning the existence and value of community assets in the control of the other spouse postseparation, the burden of proof shifts  . . ."]; *id.* at pp. 1270-1271 ["Taken together, these Family

13

Code provisions impose on a managing spouse wide-ranging duties to disclose and account for the *existence*, *valuation*, and *disposition* of all community assets from the date of separation through final property division."] emphasis in original; *id.* at p. 1273 [wife's "introduction of exhibit 18 satisfied her initial burden to show that [husband] controlled community assets of a certain value postseparation"]; *id.* at p.1280 ["it remains clear that the duty to account for the disposition of community property exists from separation to final disposition of assets"].)

Gurne's "extensive evidence" of Zinn's alleged mismanagement of community assets,[4] however, appears to pertain to the period preceding the couple's separation. Very few dates appear in the 79-page span of transcript to which he referred us, and those that do in relation to the alleged mismanagement predate the separation. Likewise, the trial court's extended written discussions of Gurne's exhibits strongly suggest that they speak to the pre-separation period, as does the court's minute order finding that Zinn did not breach her fiduciary duty and noting that the court "allows the parties to bring evidence on May 28, 2013 regarding funds removed from RKT and GZ accounts *post date of separation*." Gurne has not furnished us with copies of the relevant exhibits, nor with specific record citations affirmatively showing that the trial court's characterization of the exhibits was incorrect, despite his obligation to do so. (See, *e.g.*, *In re Marriage of Falcone* (2008) 164 Cal.App.4th 814, 822; *VL Systems, Inc. v. Unisen, Inc.* (2007) 152 Cal.App.4th 708, 711 fn. 2.) We likewise have not been provided with any argument or authority giving us a basis on which to extend the *Margulis* holding beyond its plain terms to reach pre-separation claims, or from which we can conclude that an offhand comment by the court midway through the presentation of the ostensibly pertinent evidence equates to a finding that a prima facie case has been made.

---

**4** Gurne also alleged that Zinn breached her fiduciary duty during the marriage by failing to disclose information about the businesses' finances despite oral requests for access he made between 1998 and 2000. We do not consider the trial court's judgment on this claim, as Gurne's brief fails to challenge or even mention it.

On the paltry record and briefing before us, we cannot conclude that the court erred in allocating the burden of proof.  We also note that the court expressly found that Zinn "adequately rebutted any evidence presented" by Gurne, indicating that she carried any burden of persuasion that may (or should) have been assigned to her.  We affirm the court's judgment on the challenged breach of fiduciary claims.

## III.    *The Walnut Street Properties*

### A.    **Jurisdiction**

Gurne contends that the trial court lacked jurisdiction "to award the Walnut Street Property to the Appellee."  Because the trial court expressly found that third parties hold title to the properties, he argues, it could not award the property to Zinn without joining those third parties to the action.  We review this legal issue de novo.  (See *In re Marriage of Frietas* (2012) 209 Cal.App.4th 1059, 1073.)

The trial court filed a single, combined judgment and statement of decision.  The entire document bears a footer designating it as both the statement of decision and final judgment, and it is signed once at the end.  It was the sole document filed on July 30, 2013, the date on which the accompanying Notice of Entry of Judgment indicates that judgment was filed.  Under the heading "Judgment," and subheading "Separate Property of the Petitioner," the court stated:  "Real property in the form of: (a) a commercial office building located at 24303 Walnut Street, Newhall, CA (sometimes hereinafter referred to as 'Walnut 1'), and (b) a vacant lot located at 24363 Walnut Street, Newhall, CA (sometimes hereinafter referred to as 'Walnut 2')."  Several pages later in the same document, under the subheading "Statement of Decision," the court clarified that "Walnut 1 and Walnut 2 properties are the separate property of the Petitioner, to the extent of her ownership interests as established by the legal entities which own the properties."  Gurne's argument relies entirely on the first statement at the expense of the second.  That is, he contends that the court erred by awarding title to the undivided whole of the Walnut Street properties to Zinn, but ignores the limiting language indicating that the award only went so far as "the extent of [Zinn's] ownership interests"–i.e., the

15

$400,000 escrow contributions the parties disputed at trial –and acknowledging that other "legal entities"–Tellus, LLC and Arellano–own the properties.

From a practical standpoint, Gurne is asking us to view the four pages under the heading "Judgment" as severable from the subsequent pages under the heading "Statement of Decision," so as to disregard the court's limiting language. We decline to do so. "Reviewing courts have discretion to treat statements of decision as appealable when they must, as when a statement of decision is signed and filed and does, in fact, constitute the court's final decision on the merits." (*Alan v. American Honda Motor Co.* (2007) 40 Cal.4th 894, 901.) We similarly conclude that we also have discretion to treat a single, combined document that is signed, filed, and by its terms constitutes the court's final judgment as the judgment, in its entirety. We take that approach here, and conclude that, when read as a whole, the trial court's judgment did not exceed its jurisdictional authority.

A family law court has jurisdiction to adjudicate "the property rights of the parties." (§ 2010, subd. (e).) "Obviously, the actual division of community property is affected by the characterization of specific assets, so the issue of characterization also reposes in the family law court." (*In re Marriage of Askew* (1994) 22 Cal.App.4th 942, 962.) Here, the parties asked the court to determine the ownership of, or characterize, the $400,000 escrow deposits that were applied toward the purchase of the Walnut Street properties in or about November 2005. The court took evidence from both parties and concluded that any interest in the Walnut Street properties traceable to the $400,000 contribution was the separate property of Zinn. This ruling was well within the scope of the court's authority.

Gurne contends the court went beyond that authority by awarding the entirety of the Walnut Street properties to Zinn without joining titleholders Arellano and Tellus, LLC, as parties to the action. He cites as support *In re Marriage of Glade* (1995) 38 Cal.App.4th 1441, 1450-1452, which noted that persons outside a marriage who claim an interest in community property may be joined to or intervene in dissolution proceedings,

16

and that the family law court has jurisdiction to adjudicate the property rights of such individuals participating in the suit. No third parties sought to intervene or were joined here, so, in Gurne's view, the court had no jurisdiction to adjudicate their rights.

But there is no indication that the court in fact made or even intended to make an award that had any bearing on the rights of anyone outside the marriage. The court acknowledged that other legal entities owned the properties, and that Gurne had a pending lawsuit seeking to resolve remaining questions about the properties' ownership. Gurne himself advised the trial court that neither he nor Zinn was "on ownership of the property at all," the bulk of the evidence presented on the Walnut Street properties concerned the lineage of the $400,000 escrow deposits made by the Joan Gillis Zinn Trust, and both Zinn and Gurne denied ever making any other contributions to the properties from the marital estate. In light of the record evidence and the limitation contained in the court's judgment, we conclude that the court properly exercised its jurisdiction in characterizing the $400,000 and any interest in the Walnut Street properties traceable thereto as Zinn's separate property.

### B.    The Letter

Gurne alternatively contends that even if the court appropriately exercised its jurisdiction, it misconstrued the letter he submitted and erroneously concluded that the $400,000 was Zinn's separate property. He asserts that "[i]t is hard to imagine how the mother-in-law's letter [ ] could possibly be more plain and clear in expressing that the purchase money was not intended to be the Appellee's 'separate funds.'" Although he contends that we should review the court's conclusions about the import of the letter de novo, the interpretation of the letter–and what it says about Joan Zinn's intent in making the loan–presents a question of fact that we review only for substantial evidence. (See *In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1157; *Housing Group v. PMA Capital Insurance Group* (2011) 193 Cal.App.4th 1150, 1156; cf. *Kunert v. Mission Financial Services Corp.* (2003) 110 Cal.App.4th 242, 255-256; *Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421.)

17

Gurne is correct that the letter expressly states that the $400,000 "was loaned to your family" and was "not Wendy's separate funds." If those were the only statements in the letter, he would have a much stronger argument. But the letter also expressly states that the "funds were loaned to Wendy from the trust" and "represented a loan to Wendy Zinn from the Joan Zinn Trust." The court in its capacity as factfinder was entitled to weigh these conflicting statements against one another to reach the conclusion it did; the inferences it drew about Joan Zinn's intent are plainly supported by substantial evidence. We further note that the court's interpretation of the letter and Joan Zinn's intent is buttressed by the letter's suggestion that Joan Zinn wanted Zinn – not Gurne–to sign a promissory note for the funds, as well as evidence that Joan Zinn was told about the parties' separation approximately one year before making the loan.

## DISPOSITION

The judgment of the trial court is affirmed. Appellant is to bear the costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.